**COASTAL CONSTRUCTION COMPANY, Appellant,**

v.

**TEX–KOTE, INC., Appellee.**

**No. 5791.**

Court of Civil Appeals of Texas, Waco.

Sept. 14, 1978.

Rehearing Denied Oct. 12, 1978.

Howell E. Stone and Alice Giessel, Talbert, Giessel & Stone, Inc., Houston, for appellant.

Frank M. Bean, Bean & Manning, Charles D. Boston, Fulbright & Jaworski, Houston, for appellee.

## OPINION

JAMES, Justice.

This is a wrongful death suit by the widow of a deceased workman against the owners of the Houston Astrodome, the general contractor, and the subcontractor (said sub-

contractor being the employer of the deceased). The general contractor filed a cross action over against the subcontractor for contractual indemnity. After trial by jury, the trial court awarded judgment in favor of the widow against the general contractor, and denied the general contractor judgment for indemnity against the subcontractor. Thereafter, the general contractor paid off the judgment in favor of the widow, and appealed that portion of the trial court's judgment wherein such general contractor was denied indemnity. Therefore, the sole question before us is whether or not the general contractor is entitled to indemnity against the subcontractor. We hold that the general contractor is not entitled to indemnity against the subcontractor, and thereby affirm the trial court's judgment.

Plaintiff Ann Hearn, the widow herein, brought this action against Houston Sports Association, Incorporated, the Astrodome-Astrohall Stadium Corporation, Appellant Coastal Construction Co. (the general contractor), and Appellee Tex-Kote, Inc. (the subcontractor). For purposes of this suit we will call Houston Sports Association, Inc. (hereinafter called "HSA") the owners or at least the legal entity in charge of the Houston Astrodome. The Astrodome-Astrohall Stadium Corp. is a wholly-owned subsidiary of HSA, and is a party defendant to Mrs. Hearn's suit because it was the assignee of Coastal's contract from HSA.

In the early part of 1973, HSA entered into a written contract with Coastal Construction Co. (hereinafter called "Coastal"), wherein Coastal agreed to perform certain work consisting primarily of buffing, priming, and repainting the structural steel inside the dome portion of the Astrodome.

In turn, on or about May 30, 1973, Coastal entered into a written subcontract with Tex-Kote, wherein Tex-Kote agreed to perform the major portion of the work covered by Coastal's contract with HSA.

The deceased workman, Richard Hearn, the husband of Plaintiff Ann Hearn, was an employee of Tex-Kote at the time of his death. Mr. Hearn, a 21 year old man, came to work for Tex-Kote on September 7, 1973, and died that same day when he fell from the gondola portion of the Astrodome a distance of some 208 feet to the field surface below.

The "gondola" is a cone shaped object made of structural steel, weighs 40,000 pounds, and is about seventy feet in diameter at its base. Its usual position and location is in the center of the interior of the dome, some 200 feet above the field below. Above the gondola are located equipment and cables whereby it may be lowered all the way to the playing field, or any part of the way. For a person to get to the gondola from the inside of the Astrodome, it is necessary to walk up a long catwalk, which begins at a point in the vicinity of the top of the bleacher area, which leads to a landing in the top center of the dome. From here there is a steel ladder which leads down to a circular catwalk, which is made of steel mesh about three feet wide on the walking portion, with a metal handrail on each side thereof. The inside center of the circular catwalk is about twelve feet in diameter, and is covered with one-half inch cellotex which has no structural strength.

On the day in question, Mr. Hearn was assigned to work with Fritz Crawford, a Tex-Kote employee with many years of experience in working in high places. Their work consisted of cleaning the steel girders that run up to the center of the dome, getting the rust off and putting the primer on, preparing such surfaces for painting later on. Hearn was assigned to the job of grinding the steel girders above the circular catwalk hereinabove referred to. To do this he stood upon what is called a "pickboard," which is a long aluminum board about thirty inches wide which was placed across the handrails from one side of the circular catwalk to the other. By standing on this pickboard he was able to reach above his head and grind the surfaces of the steel girders. He could move the pickboard as needed as he finished the surfaces above him. As stated, the outside of the circular railing goes straight down to the field, and the inside was floored with half-

inch cellotex which had no structural strength. All of this was pointed out to Hearn by Crawford. Negotiating the area from the catwalk to the ladder was likewise hazardous, because if a hand or foot slipped, one could easily fall to the field below without having anything to stop him.

Hearn and Crawford had been working steadily from 8 AM that day, with a half hour for lunch, until about 1:30 PM. It was hot, dirty, and strenuous work. At about 1:30 PM, Crawford found that he had missed a rust spot, and asked Hearn to let him (Crawford) use the grinder, and at the same time he suggested that Hearn go up the ladder to the next landing to get a smoke and a drink of water. Hearn stepped on the ladder with one foot on the rail and handed the grinder to Crawford. Hearn's foot was on the inside rail next to the cellotex. Crawford immediately began grinding overhead and did not see Hearn after that. Within a very short time, in a matter of seconds thereafter, Crawford was informed that Hearn had fallen. No one actually saw Hearn fall; however, a section of the cellotex located in the center area of the circular catwalk also fell to the field. There were no safety nets under the area where Hearn was working, although there had been one in the vicinity a day or two before. On the day in question, Hearn wore a safety belt which he fastened to the nearest steel truss while working, and his instructions were to unfasten his safety belt only when "travelling," meaning when changing from one work position to another.

Trial was had to a jury, which found (or failed to find) in answer to special issues as follows:

(1) Coastal was negligent in failing to provide a safety net under the area where Hearn was working;

(2) which failure was a proximate cause of Hearn's death;

(3) Jury failed to find that such failure was in heedless and reckless disregard of the rights of others affected by it.

(4) The failure of Coastal to provide flooring on the girders at the floor level of the gondola below the level where Hearn was working, was negligence;

(5) and that such failure was a proximate cause of Hearn's death.

(6) Coastal failed to initiate, maintain, and supervise any safety precautions or programs for workers situated as was Hearn;

(7) Such failure was negligence;

(8) And a proximate cause of Hearn's death.

(9) Jury failed to find that Hearn failed to keep a proper lookout. In other words, by their answer to this issue, Hearn was acquitted of negligence.

(10) This was a proximate cause issue pursuant to an affirmative answer to Special Issue No. 9, which was not necessary to be answered.

(11) Jury failed to find that "the death of Richard Hearn was caused in whole or in part by any negligent act or omission of Tex-Kote, Inc."

(12) Jury found Plaintiff Ann Hearn was entitled to $750,000 compensatory damages.

(13) Jury found zero damages for physical pain and mental anguish suffered by Hearn before his death.

(14) Jury found Mrs. Hearn was entitled to zero exemplary damages against Coastal.

(15) No answer to the comparative negligence special issue, and none necessary in view of the jury's finding that only one party (Coastal) was negligent.

Pursuant to the jury verdict, the trial court entered judgment in its pertinent parts as follows:

(1) Plaintiff Ann Hearn was awarded judgment against Coastal in the amount of $750,000.00.

(2) Since Astrodome-Astrohall Stadium Corp. had previously settled with Mrs. Hearn and had paid her $25,000.00 therefor, in accordance with such settlement Coastal was given credit for $25,000.00 against said $750,000.00 judgment.

(3) Plaintiff Ann Hearn was awarded nothing against Tex-Kote.

(4) Coastal was awarded nothing against Tex-Kote.

Coastal filed an original and amended motion for new trial, pursuant to which the trial court ordered a remittitur of $200,000.00 as a condition to the court's overruling such motion for new trial. Thereafter, Plaintiff Ann Hearn filed such remittitur, thereby reducing her net judgment to $525,000.00, after deducting said remittitur as well as the $25,000.00 credit allowed for the amount paid her by Astrodome-Astrohall. Coastal then paid Mrs. Hearn $525,000.00 and secured a release of judgment from her, and now appeals from the trial court's judgment on the indemnity question concerning Tex-Kote upon four points of error which may be summarized as follows:

(1) The trial court erred in refusing to disregard the jury's answer to Special Issue No. 11 and to hold as a matter of law that Tex-Kote was negligent, causing Hearn's death, and for such reason Tex-Kote is contractually obligated to indemnify Coastal;

(2) Coastal is entitled to indemnity as a matter of law against Tex-Kote;

(3) The jury's answer to Special Issue No. 11 is so against the great weight and preponderance of the evidence as to be manifestly wrong and unjust, under the doctrine of *In Re King's Estate* (Tex.1951) 150 Tex. 662, 244 S.W.2d 660.

We overrule all of Appellant's points and contentions and affirm the trial court's judgment.

Special Issue No. 11 was submitted to the jury in the following language:

"Do you find from a preponderance of the evidence that the death of Richard Hearn was caused in whole or in part by any negligent act or omission of Tex-Kote, Inc.?" To this the jury's answer was "We do not."

The essence of Coastal's contention is that, having paid off and satisfied the judgment to Plaintiff Ann Hearn, it is entitled to indemnity as a matter of law against Tex-Kote.

In the written subcontract between Coastal and Tex-Kote is contained the following indemnity provision, herein quoted in its pertinent parts:

"The Subcontractor (Tex-Kote) shall indemnify and hold harmless the Contractor (Coastal)_____from and against all claims, damages, losses, and expenses including attorney's fees arising out of or resulting from the performance of the Subcontractor's work under this Subcontract_____provided that any such claim_____is caused in whole or in part by any negligent act or omission of the Subcontractor_____regardless of whether it is caused in part by a party indemnified hereunder."

■ It is undisputed between Appellant and Appellee, and we agree, that the above-quoted language is clear and unambiguous, and satisfies the latest "indemnity law" handed down by our Supreme Court. See *Fireman's Fund Ins. Co. v. Commercial Standard Ins. Co.* (Tex.1972) 490 S.W.2d 818; *Sira & Payne, Inc. v. Wallace & Riddle* (Tex.1972) 484 S.W.2d 559; and *Joe Adams & Son v. McCann Construction Co.* (Tex. 1971) 475 S.W.2d 721. In other words, it is undisputed that said indemnity provision would provide indemnity for Coastal's negligence in the event of any causal negligence on the part of Tex-Kote. On the other hand, Coastal is entitled to indemnity from Tex-Kote *only* if the death of Richard Hearn were caused "in whole or in part by any negligent act or omission of the Subcontractor (Tex-Kote)."

Now, since the jury in answer to Special Issue No. 11 failed to find that Tex-Kote was guilty of any negligence causing Hearn's death, Coastal is in the position of contending that the evidence conclusively establishes that Tex-Kote was negligent; that is to say, that Tex-Kote was negligent as a matter of law. Alternatively, Coastal asserts the factual insufficiency of the jury's negative finding in answer to Special Issue No. 11. We do not agree with either contention.

At the outset, both Appellant and Appellee agree that accompanying every contract is the common law duty to perform with ordinary care, and that negligent omission or commission concerning the performance of such contract is a tort as well as a breach of contract. *Montgomery Ward v. Scharrenbeck* (Tex.1947) 146 Tex. 153, 204 S.W.2d 508 at p. 510.

This being so, in order to evaluate the Appellant Coastal's contentions we deem it necessary to quote pertinent provisions in the contract between HSA and Coastal on the one hand, and the subcontract between Coastal and Tex-Kote. Then by holding these contractual provisions up in the light of the jury's findings, we may be able to arrive at a determination of whether Coastal is entitled to indemnity against Tex-Kote.

The written contract between Coastal and HSA contains the following language:

"The Contractor shall provide a safety net just under the main structure to protect both the people and property."

\*     \*     \*     \*     \*     \*

"10.1.1 The Contractor shall be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the Work."

"10.2.1 The Contractor shall take all reasonable precautions for the safety of, and shall provide all reasonable protection to prevent damage, injury or loss to:

.1    all employees on the Work and all other persons who may be affected thereby."

\*     \*     \*     \*     \*     \*

"10.2.2 The Contractor shall comply with all applicable laws, ordinances, rules, regulations and lawful orders of any public authority having jurisdiction for the safety of persons or property or to protect them from damage, injury or loss. He shall erect and maintain, as required by existing conditions and progress of the Work, all reasonable safeguards for safety and protection, including posting danger signs and other warnings against hazards, promulgating

safety regulations and notifying owners and users of adjacent utilities."

\*     \*     \*     \*     \*     \*

"10.2.5 The Contractor shall designate a responsible member of his organization at the site whose duty shall be the prevention of accidents. This person shall be the Contractor's superintendent unless otherwise designated in writing by the Contractor to the Owner and the Architect."

\*     \*     \*     \*     \*     \*

"1–13.   *Temporary Safeguards and Protection*

"a.   The Contractor shall safeguard his work as required by law, the HSA, or by the Engineer for the protection of those on or near the job site. All damage of whatever nature, caused by the Contractor's failure to provide proper safeguards shall be made good and paid for by him.

"b.   No requirement of or omission to require any precautions under this contract shall be deemed to limit or impair any responsibilities or obligations assumed by the Contractor under or in connection with this contract, and the Contractor shall at all times maintain adequate protection to safeguard the public and all persons engaged in the performance of this Contract and shall take such precautions as will accomplish such end without undue interference with the public or the operations of the Astrodome."

\*     \*     \*     \*     \*     \*

"4.10.1 The Contractor shall be responsible to the owner for the acts and omissions of all his employees and all Subcontractors, their agents and employees, and all other persons performing any of the Work under a contract with the Contractor."

\*     \*     \*     \*     \*     \*

"4.3.1 The Contractor shall supervise and direct the Work, using his best skill and attention. He shall be *solely* responsible for all construction means, methods, techniques, sequences and procedures and *for* coordinating all portions of the Work under the Contract." (emphasis supplied).

The written subcontract between Coastal and Tex-Kote contains the following language:

"The Contractor shall be bound to the Subcontractor and the Subcontractor shall be bound to the Contractor by the terms of this Subcontract and of the Contract Documents between the Owner and the Contractor, and shall assume each to the other, all the obligations and responsibilities which the Contractor, by these documents, assumes toward the Owner, and the Owner assumes toward the Contractor, and each shall have the benefits of all rights, remedies and re-dress against the other, which by the Contract Documents, the Owner and the Contractor have against one another, insofar as applicable to this Subcontract, provided that when any provision of the Contract Documents between the Owner and the Contractor is inconsistent with any provision of this Subcontract, this Subcontract shall apply."

\*　　\*　　\*　　\*　　\*　　\*

"The work to be performed under this Subcontract covers the repainting of the surfaces of all existing structural steel members of the roof structure of the domed stadium which are accessible from within the stadium, Item 4–01a(3) of Section 4 of the Specifications. The work shall be performed in accordance with the applicable requirements of Section 4, Repainting of Existing Structural Steel, and shall also include the following:

"1. Furnishing of all scaffolding, supports and protection necessary to accomplish the work under this Subcontract. To the maximum extent possible, all scaffolding, supports and protection will be utilized for all purposes of construction. The Subcontractor will make every effort to prevent needless duplication of scaffolding, and support and protection installation.

"2. Temporary lighting and electric power wiring as required from existing outlets."

\*　　\*　　\*　　\*　　\*　　\*

"Final payment shall be due when the work described in this Subcontract is fully completed and performed in accordance with the Contract Documents and is satisfactory to the Engineer. Final payment, constituting the unpaid balance due, including retainage, will be paid Contractor when the work has been completed, the Contract fully performed, and, if applicable, a final Certificate of Payment has been issued by the Engineer."

\*　　\*　　\*　　\*　　\*　　\*

"The Subcontractor shall take necessary precautions to protect properly the finished work of other trades from damage caused by his operations.

"The Subcontractor shall at all times keep the building and premises clean of debris arising out of the operations of this Subcontract. Unless otherwise provided, the Subcontractor shall not be held responsible for unclean conditions caused by other contractors or subcontractors.

"The Subcontractor shall take all reasonable safety precautions with respect to his work, shall comply with all safety measures initiated by the Contractor and with all applicable laws, ordinances, rules, regulations and orders of any public authority for the safety of persons or property in accordance with the requirements of the Contract Documents. The Subcontractor shall report within three days to the Contractor any injury to any of the Subcontractor's employees at the site."

\*　　\*　　\*　　\*　　\*　　\*

"The Subcontractor's and Contractor's signatures below shall constitute this agreement as a binding contract between the parties named, and our respective heirs, executors, administrators, successors, and assigns, which contract shall be deemed dated as of the day and year specified below, upon such acceptance this written contract shall comprise the entire agreement relating to this work. No other agreement or understanding concerning the same, and no oral statement, understanding, or agreement shall affect the terms of this contract."

Then lastly, said subcontract contains the indemnity provision hereinabove quoted in this opinion, wherein Tex-Kote agreed in effect to indemnify Coastal from damages

arising out of the Tex-Kote's performance of the subcontract caused "in whole or in part" by Tex-Kote's negligence, regardless of whether Coastal was negligent or not.

At first blush it is apparent to see that in Coastal's contract with HSA, Coastal assumed obligations to HSA that far exceeded the obligations which Tex-Kote assumed to Coastal in the subcontract. Moreover, we are mindful that the Subcontract provides that when any provision of the Contract is inconsistent with any provision of the Subcontract, that the Subcontract will control over the Contract.

As we understand it, Coastal's argument is that Tex-Kote assumed "all the obligations and responsibilities which the Contractor (Coastal), by these documents, assumes toward the Owner (HSA)"; that since the jury found Coastal causally negligent in three different respects, that by contract, Tex-Kote was likewise causally negligent in these same three respects; therefore, Coastal is entitled to contractual indemnity against Tex-Kote. We do not agree.

The jury found Coastal to be guilty of three grounds of causal negligence, to wit:

(1) In failing to provide a safety net under the area where Hearn was working;

(2) In failing to provide flooring on the girders at the floor level of the gondola below the level where Hearn was working; and

(3) In failing to initiate, maintain, and supervise any safety precautions or programs for workers situated as was Hearn.

Let us examine the respective obligations of the parties as regards each of the three grounds of negligence:

■ (1) *Failure to provide a safety net under the area where Hearn was working:* By its written contract with HSA, Coastal expressly agreed "to provide a safety net under the main structure" of the Astrodome. By Tex-Kote's written subcontract with Coastal, Tex-Kote neither expressly nor impliedly agreed to assume such a responsibility. Whatever responsibility Tex-Kote may have assumed concerning safety nets was not expressed; however, if Tex-

Kote had any such responsibility by implication it was qualified and limited by such language as "insofar as applicable," "necessary" or "reasonable." In short, the mere fact that Coastal was causally negligent for failure to provide a safety net does not mean that Tex-Kote was also negligent for the same such failure. The respective contractual responsibilities of Coastal and Tex-Kote were different, and it was well within the province of the jury to find Coastal negligent and fail to find Tex-Kote negligent in this regard.

(2) *Failure to provide flooring on the girders at the floor level of the gondola below the level where Hearn was working:* In this connection, Coastal asserts that Tex-Kote was negligent per se for violation of Articles 5182 and 5182–1, Revised Civil Statutes of Texas: The pertinent language of Articles 5182 and 5182–1 applicable to the case at bar are identical and read as follows:

"Article 5182. Protection of workmen on buildings

"1. To prevent workmen from falling.— Any building three or more stories in height, in the course of construction or repair, shall have the joists, beams or girders of each and every floor below the floor level where any work is being done, or about to be done, covered with planking laid close together, said planking to be of not less than one and one-half inches of thickness in buildings that have steel framework, and what is commonly known as one-inch plank in all others where joists are set on two foot centers or less, to protect the workmen engaged in the erection or construction of such buildings from falling through joists, girders, and from falling planks, bricks, rivets, tools or other substances, whereby life and limb are endangered."

We cannot see how Articles 5182 and 5182–1 have any application to a building such as the Houston Astrodome, which is not "three or more stories in height." As a lamella structure, it has no "stories." Moreover, the Astrodome could not "have the joists, beams or girders of each and

**408**

every floor below the floor level where any work is being done\_\_\_covered with planking laid close together," because, as a lamella structure, it has no "floors" contemplated by the statute.

 We are of the opinion, and hold that Articles 5182 and 5182–1 do not apply to a building such as the Astrodome. However, assuming for the sake of argument that it does apply, Tex-Kote introduced proof that it would be more dangerous to install planking across the base of the gondola than it would be for the workmen to perform their work without the planking, as long as the men were using their customary safety equipment. This being so, for Coastal to establish negligence per se against Tex-Kote for statutory violation, Coastal had the burden to establish a jury finding not only of the statutory violation, but also a jury finding that such violation was unexcused. This Coastal did not do. See *Southern Pacific Co. v. Castro* (Tex.1973) 493 S.W.2d 491, 497. Therefore, Coastal has not established that Tex-Kote is guilty of negligence per se in connection with its asserted failure to provide flooring at the base of the gondola. It was within the jury's province to find Coastal causally negligent in this failure to provide flooring, and to fail to find Tex-Kote negligent therefor, which was done by the jury.

 (3) *Failure to initiate, maintain, and supervise any safety precaution or programs for workers:* As respects safety precautions or programs, by its written contract with HSA, Coastal expressly agreed to "be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the work," and to "designate a responsible member of his organization at the site whose duty shall be the prevention of accidents." By the written subcontract with Coastal, Tex-Kote neither expressly nor impliedly agreed to assume such a responsibility.

 In summary, in order to be entitled to indemnity against Tex-Kote, Coastal had the burden of establishing that Tex-Kote was causally negligent as regards Hearn's death. Since the jury failed to find that Tex-Kote was negligent, Coastal had the burden of establishing either (1) that the evidence conclusively established that Tex-Kote was causally negligent or (2) that the jury's answer to Special Issue No. 11 was factually insufficient. For the reasons hereinabove given, we are of the opinion and hold that Coastal has failed to meet its burden in either instance, and therefore that Coastal is not entitled to indemnity as against Tex-Kote.

Judgment of the trial court is accordingly affirmed.

AFFIRMED.