UMC, INC., Appellant,

v.

COONROD ELECTRIC CO., INC., and Arthur Brothers, Inc., Appellees.

No. 13–82–169–CV.

Court of Appeals of Texas, Corpus Christi.

September 22, 1983.

Rehearing Denied Nov. 3, 1983.

Frank E. Weathered, Meredith & Donnell, Corpus Christi, for appellant.

Thomas H. Crofts, Jr., Ann Livingston, Damon Ball, Groce, Locke & Hebdon, San Antonio, Steve T. Hastings, Law Office of Guy Allison, Corpus Christi, for appellees.

Before BISSETT, UTTER and GONZALEZ, JJ.

## OPINION

GONZALEZ, Justice.

This is an appeal from a judgment in a personal injury suit denying claims for indemnity and contribution. After a jury trial, the trial court granted the injured party a money judgment against UMC based on strict liability and negligence and denied UMC's claim for indemnity and contribution against appellees. Appellant appeals only that portion of the judgment that denied it indemnity and contribution. We affirm.

*Facts*

On January 27, 1980, Theodore Hernandez was working as a utility worker for Virginia Chemicals Company in a plant near Bishop, Texas. As Hernandez was throwing handfuls of sodium formate between a conveyor belt and the rollers in order to create friction and prevent slippage, his hand and arm were pulled into the rollers causing extensive injuries to the upper body. The resulting injury necessitated the amputation of his left arm above the elbow.

The plant had three separate conveyors, two of which were installed with pull-cord safety switches so that they could be shut down immediately in the event of a mishap. These two conveyors had walkways along one side of the conveyor and the pull-cord safety switches were next to the walkway. The one involved in the accident had no such switch despite the fact that the plans called for one, nor was there a walkway next to this conveyor. (It is clear from the the evidence that UMC left off the switch on this conveyor.)

The plant was designed by Jacobs Engineering Group, Inc. and the conveyor systems were sold and installed by UMC, a subsidiary of Jacobs. The conveyor system was fabricated by Taunton Engineering Company. Coonrod Electric Co., Inc. did the electrical wiring, including that related to the conveyor systems. Arthur Brothers contracted with Virginia Chemicals, the owner of the plant, to maintain the plant once operational.

After the accident, Hernandez filed suit against UMC, Jacobs Engineering, Taunton Engineering and Arthur Brothers. This suit spawned various cross-actions among the defendants, each of them seeking to distribute the amount of damages or to shift the entire loss from one defendant to another.

After the close of the evidence, but prior to the submission of the charge, Hernandez nonsuited Taunton, which had settled with Hernandez under a "Mary Carter" type agreement. Based on the jury's verdict, judgment was rendered for Hernandez

against UMC in the amount of Eight Hundred Ninety Thousand One Hundred Fifty Dollars and ³⁴/₁₀₀ ($890,150.34). Subsequently, the judgment against UMC was released by Hernandez in consideration for the payment of Seven Hundred Fifty Thousand Dollars ($750,000.00). This appeal followed and it concerns only UMC's claims for contribution and indemnity against Coonrod and Arthur Brothers.

Among other things, the jury found that:

1a) the conveyor in question left UMC's possession without a pull-cord safety switch;

1b) the absence of such rendered it defective;

1c) such defect was a producing cause of the occurrence in question;

2a) UMC failed to give adequate warning of the danger or adequate instructions for safe use of said conveyor without a pull-cord safety switch at the time of installation;

2b) that such rendered the item unreasonably dangerous as marketed;

2c) and this was a producing cause of the occurrence in question;

3) the conveyor was not defectively designed by Taunton;

4) Hernandez did not assume the risk nor was he negligent.

The jury also found UMC negligent in failing to install a pull-cord safety switch, and that such was a proximate cause of the occurrence in question. No other defendant was found negligent.

In its fifth point of error, UMC claims that it is entitled to indemnity from Coonrod as a matter of law. Specifically, UMC contends that the record conclusively shows that Coonrod breached a contractual duty it owed to UMC since Coonrod allegedly did not report the deletion of the safety switch to UMC.

The basis for UMC's indemnity claim is that the contract entered into between them contains the following provision:

Coonrod "shall indemnify and hold harmless" UMC "from all losses, ... for injury ... to any person ... resulting from

... or in any way connected with the activities of" Coonrod "regardless of whether the same may arise in whole or in part from the negligence or alleged negligence of" UMC "and likewise from all losses ... however caused because of damage to property or injury or alleged injury ... while on premises under the control of" Coonrod "or while the same are performing under this agreement."

### Indemnity-Pleading

█ Before we consider the issue of indemnity, we first address Coonrod's contention that contractual indemnity was not properly pleaded. Generally,

[a] petition in an action predicated upon a contract must contain a short statement of the cause of action sufficient to give fair notice of the claim involved, including an allegation of a contractual relationship between the parties, and the substance of the contract which supports the pleader's right to recover. *Air & Pump Co. v. Almaquer,* 609 S.W.2d 309, 313 (Tex.Civ.App.—Corpus Christi 1980, no writ).

We have reviewed UMC's pleadings and agree with Coonrod that UMC's claim for indemnity against Coonrod and Arthur Brothers is based solely on negligence.

In *Almaquer,* there were proper objections to the introduction of the indemnity contract upon the ground that such claim was not supported by the pleadings. No such objections were made here. The contract was admitted for all purposes.

"When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. In such case, such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made by leave of court upon motion of any party at any time up to the submission of the case to the Court or jury, but

failure so to amend shall not affect the result of the trial of these issues...." Rule 67, TEX.R.CIV.P.

In numerous contract disputes, the Supreme Court of Texas has repeatedly written: "It is elementary that if there is no ambiguity, the construction of the written instrument is a question of law for the court." *City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515, 518 (Tex.1968); *Myers v. Gulf Coast Minerals Management Corp.*, 361 S.W.2d 193, 196 (Tex.1962). The meaning of the indemnity contract before us is therefore a question of law for the court. *Accord Gulf, Colorado and Santa Fe Railway v. Coca-Cola Bottling Co.*, 363 F.2d 465, 467 (5th Cir. 1966). It is the province of the jury to determine the facts and the province of the court to construe the coverage of an indemnity contract and to apply that contract to the facts found by the jury. *Scherff v. Missouri-Kansas-Texas Railroad*, 449 F.2d 23, 28 n. 2 (5th Cir.1971). The interpretation of a contract becomes a fact issue for the jury only when the application of pertinent rules of construction leaves a genuine uncertainty as to which of two meanings is proper. *Harris v. Rowe*, 593 S.W.2d 303, 306 (Tex.1979); *Aztec Services, Inc. v. Quintana-Howell Joint Venture*, 632 S.W.2d 160 (Tex.App.—Corpus Christi 1982, writ ref'd n.r.e.). Therefore, we are of the opinion that introduction of the contract into evidence put that instrument before the court for its consideration and effectively served to try the issue by consent.

### Indemnity

"Indemnity means that a tortfeasor, who has been unjustly enriched at the expense of another tortfeasor, is obligated to indemnify the other tortfeasor." Keeton, *Annual Survey of Texas Law*, 34 S.W.L.J. 1, 16 (1980). It is an all or nothing proposition. If allowed, it shifts the entire burden of paying the judgment from one tortfeasor to another. On the other hand, contribution distributes the burden of a judgment among liable tortfeasors on the basis of proportionate shares. Comment, *Indemnity and Contribution Among Joint Tortfeasors*, 15 Hous.L.Rev. 1004 (1978); Sales, *Contribution and Indemnity Between Negligent and Strictly Liable Tortfeasors*, 12 St. Mary's L.J. 323 (1980). The right to indemnity and the obligation to indemnify generally spring from contract, express or implied, which contract determines the extent of the right to be indemnified, and in the absence of an express or implied contract a right to indemnity does not exist. 42 C.J.S. *Indemnity* § 2 (1944). An implied contract of indemnity arises in favor of a person who without any fault on his part is exposed to liability and compelled to pay damages on account of the tortious act of another, provided they are not joint tortfeasors. 42 C.J.S. *Indemnity* §§ 21, 27 (1944).

This area of the law has been fertile for much litigation and development. Where there is no express contract for indemnity, several approaches to determine when indemnification will be allowed have been tried. The earlier Texas cases used the "active vs. passive" negligence approach. This approach was rejected by the Supreme Court in *Austin Road Co. v. Pope*, 147 Tex. 430, 216 S.W.2d 563 (1949) and instead a "breach of duty between tortfeasors" approach was adopted. *See General Motors Corp. v. Simmons*, 558 S.W.2d 855, 859 (Tex.1977). Comment, *Comparative Causation, Indemnity and the Allocation of Losses Between Joint Tortfeasors in Products Liability Cases*, 10 St. Mary's L.J. 587 (1979); Comment, *Indemnity and Contribution Among Joint Tortfeasors*, 15 Hous.L.Rev. 1004 (1978). This approach has now been replaced with a "comparative fault" scheme as the way to apportion damages caused by fault attributed to plaintiffs and defendants. *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 26 Tex.Sup.Ct.J. 507 (Tex. 1983). However, since the basis of the indemnity claim in our case is the contract between the parties, the contract determines the rights of the parties.

*Contractual Indemnity*

This Court recently reviewed the standards to be applied in determining whether a party is entitled to indemnity pursuant to a contract in *McKesson Chemical Co. v. Phelps Dodge Corp.*, 638 S.W.2d 64, 66–67 (Tex.App.—Corpus Christi 1982, writ ref'd n.r.e.), wherein we held:

> In order for an indemnity agreement to protect an indemnitee from the consequences of its own negligence, the obligation of the indemnitor to do so need not be stated in so many words, but must be expressed in clear and unequivocal terms. *Fireman's Fund Insurance Co. v. Commercial Standard Insurance Co.*, 490 S.W.2d 818, 822 (Tex.1973); *Sira & Payne, Inc. v. Wallace & Riddle*, 484 S.W.2d 559, 561 (Tex.1972); *Joe Adams & Son v. McCann Construction Co.*, 475 S.W.2d 721, 723 (Tex.1972).

\*  \*  \*  \*  \*  \*

These same rules will be applied in determining whether an agreement purports to indemnify one against the consequences of supplying a defective product. *See Rourke v. Garza*, 511 S.W.2d 331, 341 (Tex.Civ.App.—Houston [1st Dist.] 1974), aff'd, 530 S.W.2d 794 (Tex.1975).

The contractual indemnity provision in the instant case does not expressly provide for indemnification for UMC's transgressions in either providing a defective product or in marketing an unreasonably dangerous one. Each is an act for which liability is incurred under the doctrine of strict liability. *See* W. Prosser, *Handbook of the Law of Torts* § 99 (4 ed. 1971). As such, liability based thereon is divorced from any findings of negligence. Id., § 75, p. 496. Therefore, we hold that it was not the intent of the parties for Coonrod to indemnify UMC if UMC marketed a defective product. The denial of indemnification by Coonrod to UMC was proper.

UMC also alleges that, if indemnity was denied, it is entitled to contribution from Coonrod. This, too, was properly denied for, not only does the contract limit Coonrod's exposure to liability while they are on the premises performing under the contract, but, more importantly, for the reasons discussed below, Coonrod was not a joint tortfeasor.

*Special Issues*

In response to Special Issue 18, the jury found that Larry Sorrell, Coonrod's foreman at the Bishop plant, did not fail to notify Pete Christopher, UMC's project supervisor, that he (Sorrell) had not wired the pull-cord safety switch on the conveyor where the accident occurred. In its first two points of error, UMC challenges both the legal and factual sufficiency of the evidence to support this finding. In reviewing legal sufficiency ("no evidence") points, we shall view the evidence in a light most favorable to the jury finding, considering only the evidence and inferences in support thereof, while ignoring the evidence and inferences contrary thereto. *Miller v. Riata Cadillac Co.*, 517 S.W.2d 773, 777 (Tex.1974); *Salazar v. Hill*, 551 S.W.2d 518, 519 (Tex.Civ.App.—Corpus Christi 1977, writ ref'd n.r.e.). In considering factual ("against the great weight and preponderance of the evidence") points, we shall examine the entire record and determine whether, in light thereof, the finding is manifestly unjust. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951); *Salazar v. Hill*, 551 S.W.2d 518.

It is undisputed that UMC's subcontract with Coonrod called for Coonrod to wire the conveyor circuits, including the pull-cord switches, once such had been installed by UMC. Sorrell testified that after the conveyors had been set in place, he ran the conduit through which he was to run the electrical wiring to them. When he got to the conveyor in question, he found no safety switch as his plans specified. The evidence concerning what happened next is conflicting. Sorrell stated that he went to the on-site office shared by Christopher and Quinton Roesser, Virginia Chemicals' project engineer, and reported this fact. His memory of this event was unclear. To the best of his recollection, there were sev-

eral people in the office at the time and he was told by someone that the switch had been deleted, and to simply bypass that circuit. He testified that it was either Roesser or Christopher who told him this, but he could not be sure which, although he thought it was the former. He marked his copy of the electrical schematic "delete" where the switch should have been installed. He said that he would not have deleted it without authorization from one of those two men.

Sorrell stated that it was his custom to check with Christopher before making changes, but that he could have made them on instruction from Roesser without awaiting Christopher's approval. He did not recall ever making any changes at Roesser's request which were not also communicated to Christopher.

Sorrell also testified concerning a conversation he had had with one of UMC's foremen who was in charge of the steel work at the plant, concerning the safety switch on the conveyor after he had completed the wiring. He was informed that a decision had been made to delete the switch.

Neither Christopher nor Roesser recalled having had a conversation concerning the deletion of the switch. Each claimed to have been ignorant of that fact until after the mishap. Christopher's initial reaction was that one had been installed as planned, but had rusted off. After hearing Sorrell's testimony, however, he stated that he would have to agree that one had never been installed at all.

Christopher was of the opinion that Sorrell should not have taken instructions from anyone but him, and that he should have been consulted regarding any deletions. To his knowledge, Roesser had never given any subcontractors at the Virginia Chemicals project instructions to delete anything.

Roesser testified that he had no recollection of Sorrell having come to him concerning the missing switch, although he did not deny that that could have happened. However, he stated that he would not have simply changed the plans and specifications

arbitrarily, but would have gone through Virginia Chemicals' company headquarters and obtained a new set of blueprints showing the deletion. There was no evidence of this having been done. Roesser, while he had the authorization to do so, testified that he would not have gotten involved with such a change order without going to Christopher first, and he did not recall having done so.

As concerns conflicting evidence which raises conflicting inferences, the rules by which we are guided are set forth by this Court in *Salazar v. Hill*, 551 S.W.2d at 520.

> The mere fact that we might have reached a different conclusion on the facts does not authorize us to substitute our judgment for that of the jury. *Dallas Ry. & Terminal Co. v. Farnsworth*, 148 Tex. 584, 227 S.W.2d 1017 (1950). It is within the jury's province to judge the credibility of the witnesses and the weight to be given their testimony, and to resolve conflicts and inconsistencies in testimony of any one witness as well as testimony of different witnesses. Further it is within the jury's province to believe one witness and disbelieve another, or to believe part of the testimony of a witness and disbelieve any other part. *Scott v. Gibson Oil Company*, 471 S.W.2d 924 (Tex.Civ.App.—Tyler 1971, no writ).

■ The testimony recited above supports the finding that Sorrell did not fail to notify Christopher of the absence of the safety switch, and such is not against the great weight and preponderance of the evidence.

■ In its third and fourth points of error, UMC claims error on the part of the trial court in refusing to submit its requested issues inquiring as to whether Coonrod failed to complete the wiring as required by its contract with UMC, and whether such failure was in any way connected to the occurrence in question. Assuming the validity of such inquiries, we are of the opinion the trial court's refusal does not constitute reversible error. The testimony of

Christopher and Lionel Kantrowitz, the project manager for Jacobs, UMC's parent company, was unequivocal to the effect that it was UMC's responsibility to install the safety switch, and that Sorrell could not wire to it in its absence. Further, Kantrowitz stated that it would be expected of Sorrell to approach either Christopher or Roesser upon discovering that the switch was missing and inquire about it; and having done that, Coonrod would be relieved of responsibility. We find that the trial court's refusal of these issues was not error. Points of error 1, 2, 3, 4 and 5 are overruled.

### Contribution—Arthur Brothers

In several points of error, UMC contends that they are entitled to a remand of this case for a new trial on UMC's claim for contribution from Arthur Brothers.[1] Before contribution is allowed, certain requirements must be met:

> First, a tortfeasor must discharge the liability to plaintiff of the other tortfeasor. Second, a tortfeasor must be established as a judgment debtor through the rendition of a contested or agreed judgment. Finally, a tortfeasor receives a contribution of the plaintiffs' damages. *Lubbock Manufacturing Co. v. International Harvestor Co.*, 584 S.W.2d 908, 911 (Tex.Civ.App.—Dallas 1979, writ ref'd n.r.e.) (citations omitted.)

For the reasons which we will now discuss, Arthur Brothers is not a tortfeasor in this case and UMC's claim for contribution against Arthur Brothers was properly denied.

In points of error six and seven, the jury finding that Arthur Brothers did not fail to maintain the belt tension on the conveyor in question is challenged on the basis of both legal and factual sufficiency of the evidence.

Duties owed by Arthur Brothers must arise out of the maintenance agreement it had with Virginia Chemicals or by duties imposed by law. The contract provided in part:

> ARTICLE 1. *SCOPE OF WORK.* During the term hereof Contractor [Arthur Brothers] shall furnish all labor, all supervision and other personnel for the performance of maintenance and other related types of work at Company's [Virginia Chemicals] Bishop, Texas plant, when and as requested by Company.

The evidence concerning Arthur Brothers' duties under its contract with Virginia Chemicals was limited to that of Albert Najavar, Arthur Brothers' maintenance foreman at the plant.[2]

The maintenance performed by Arthur Brothers' personnel was done on the "job order system," that is, "when and as requested by Virginia Chemicals." Najavar testified that when the belt tension needed adjusting, it would be brought to his attention by the Virginia Chemicals' foreman, who would have found out from its operators. The actual adjustment of the belt, which was accomplished via the use of "take-up screws," only had to be performed every several months, or on an average of a couple of times a year. Generally, when informed of slippage, Najavar found that the problem could be remedied by simply washing off the underside of the conveyor belts and the rollers where the product, which was highly susceptible to humidity, would collect and form a slimy buildup. He had not been notified of a slippage problem just prior to the accident. Similarly, there had been no increase in slippage

---

1. This case has been before us on a prior occasion on UMC's appeal from a judgment sustaining Arthur Brothers' plea of privilege. *UMC, Inc. v. Arthur Bros., Inc.*, 626 S.W.2d 819 (Tex. App.—Corpus Christi 1981, writ ref'd n.r.e.). We reversed and rendered that the plea of privilege be denied.

2. Robert Brockett of Virginia Chemicals also testified by deposition. However, it was stipulated by the parties that, since Brockett's deposition was taken prior to the time that Arthur Brothers was made a party to the suit, it was not admissible against Arthur Brothers. *Elizondo v. Tavarez*, 596 S.W.2d 667, 670 (Tex.Civ.App.—Corpus Christi 1980, writ ref'd n.r.e.); *Academy Welding v. Carnes*, 535 S.W.2d 917, 919 (Tex.Civ. App.—Corpus Christi 1976, no writ).

problems in the year preceding the occurrence.

■ The requisite duty to maintaining a cause of action sounding in negligence may be created by contract. *Montgomery Ward & Co. v. Scharrenbeck,* 146 Tex. 153, 204 S.W.2d 508, 510 (1947). Thus, the breach of a contractual duty may give rise to a tort. *Coastal Construction Co. v. Tex-Kote, Inc.,* 571 S.W.2d 400, 405 (Tex.Civ.App.—Waco 1978, writ ref'd n.r.e.). We find the evidence sufficient to support the finding that Arthur Brothers had not failed to fulfill its contractual obligations concerning belt tension and overrule these two points of error.

■ Points eight and nine complain of the trial court's refusal to submit UMC's issues inquiring whether Najavar's failure to notify Brockett of Virginia Chemicals of the absence of a pull-cord safety switch constituted negligence and a proximate cause of the accident. For the same reasons as discussed above, we are of the opinion that no such duty existed.

Arthur Brothers' duties under its contract were solely involving maintenance. It has been held that: " 'Maintenance' does not include operation or supervision of operation or advice regarding operation." *Blackhawk Hotels Co. v. Bonfoey,* 227 F.2d 232, 238 (8th Cir.1955); *Abernathy v. Otis Elevator Corp.,* 533 P.2d 971, 974 (Okl.1975); *Otis Elevator Co. v. Embert,* 198 Md. 585, 84 A.2d 876, 883 (1951). Similarly, it has been held that a maintenance contract does not place upon the contractor responsibility for design defects. *Brewer v. Otis Elevator Co.,* 422 S.W.2d 766, 769 (Tex.Civ.App.—Houston [1st Dist.] 1967, writ ref'd n.r.e.). While Najavar testified to having noticed that there was no switch on the conveyor in question, neither Arthur Brothers' maintenance contract nor the manner in which its personnel performed their duties cast upon it a duty to draw to the attention of Virginia Chemicals that which its personnel might have perceived as defects in the design or the construction of the plant. Points of error eight and nine are overruled.

■ This lack of a duty on the part of Arthur Brothers is also dispositive of points of error ten, eleven and twelve, in which error is asserted in the trial court's refusal of UMC's requested issues inquiring, respectively, whether Arthur Brothers knew or should have known that employees of Virginia Chemicals were throwing product onto the conveyor pulley in order to prevent slippage, and whether the failure on the part of Arthur Brothers' personnel to report such acts to Brockett constituted negligence and a proximate cause of the occurrence. As concerns points eleven and twelve, we note additionally that both Hernandez and his co-worker, James Hill, testified that throwing product onto the conveyor rollers was standard procedure at the plant, and that such was done on the instruction of their foreman, Lee Wilson. Thus, Virginia Chemicals would already be charged with notice of this practice. These points of error are overruled.

### *Exclusion of Testimony*

In UMC's thirteenth point of error, complaint is made regarding the trial court's refusal to admit into evidence those portions of Gilbert Lavoie's testimony concerning the corroded condition of the take-up screws on the conveyor belt. Lavoie, President of Taunton, examined the conveyor approximately seven weeks after the accident. Outside of the presence of the jury, he stated that it was his opinion that, at that time, the screws were so badly corroded that they would not have been functional were an attempt made to adjust the belt tension. Extensive voir dire examination was conducted by counsel for UMC, counsel for Arthur Brothers, and by the trial court. Lavoie originally stated that, due to his examination, he was of the opinion that the screws were also so corroded at the time of the accident that they would not have been operational. However, he went on to say that there was no way of telling over how long a period of time the screws had corroded, and that, if the equipment had been lying dormant, out of use and

unmaintained during the period between the accident and his inspection (as it apparently had been), that the corrosion process would have been greatly accelerated. The question was asked:

"And, therefore, you could not say the extent, if any, to which there was corrosion on the take-up screws at the time of the accident?"

To which Lavoie responded:

"No, there is no way I would know that, really."

 The general rule is that the determination of the admissibility of opinion testimony is a matter within the sound discretion of the trial court, which determination will not be disturbed on appeal absent a showing of abuse. *Southwestern Bell Telephone Co. v. Sims*, 615 S.W.2d 858, 862 (Tex.Civ.App.—Houston [1st Dist.] 1981, no writ); *Columbia Engineering International Ltd. v. Dorman*, 602 S.W.2d 72, 77 (Tex.Civ.App.—Beaumont 1980, writ ref'd n.r.e.). Opinions which are purely speculative or conjectural in their nature should be excluded. 2 Ray, *Texas Practice, Law of Evidence*, § 1399, p. 19 (West 1980). No abuse of discretion is shown, and the point is overruled.

We have reviewed all points of error and we find no reversible error. The judgment of the trial court is AFFIRMED.

## OPINION ON MOTION FOR REHEARING

On appellant's motion for rehearing, no new argument is presented. However, appellant misconstrues our holding regarding its claim for common law indemnity. To clarify the matter, we did not hold that "the existence of a contractual indemnity provision forcloses the possibility of common law indemnity" as asserted by appellant. We did hold that UMC is not entitled to *contractual indemnity* because the obligation of the indemnitor (Coonrod) was not expressed in clear and unequivocal terms and also hold that the reason they are not entitled to *common law indemnity* is because they did not meet either of the criteria which must be present in order for

the courts to imply such a contract. UMC was not exposed to liability without any fault on their part nor were they compelled to pay damages on account of the negligence or tortious act of another. See 42 C.J.S. *Indemnity* § 21 (1944).

As to appellant's contentions against Arthur Brothers, we have considered all of the evidence and we adhere to our original disposition.

The motion for rehearing is OVERRULED.