United States Court of Appeals,

Fifth Circuit.

No. 91–8176.

HONDO OIL AND GAS COMPANY, Plaintiff–Appellant–Cross Appellee,

v.

TEXAS CRUDE OPERATOR, INC., Defendant–Third Party
Plaintiff–Appellee–Cross–Appellant,

v.

ATLANTIC RICHFIELD COMPANY, Third Party Defendant–Appellant–Cross–Appellee.

Sept. 3, 1992.

Appeals from the United States District Court for the Western District of Texas.

Before POLITZ, Chief Judge, and WILLIAMS, Circuit Judge, and FELDMAN,[*] District Judge.

JERRE S. WILLIAMS, Circuitudge:

Texas Crude Operator, Inc. and Atlantic Richfield Company entered into three operating agreements for oil properties in Texas. Many years later, the companies began disputing whether they had modified the accounting procedure of the contract. Atlantic Richfield withheld money that it considered it was overcharged. Atlantic Richfield subsequently sold its interest to Hondo Oil and Gas Company. Hondo Oil and Gas brought suit when it realized Texas Crude was withholding money from it to offset the money Atlantic Richfield withheld. Texas Crude then filed a third party complaint against Atlantic Richfield. The district court held that the operating agreements had been modified. The court further held that Atlantic Richfield breached the agreements by withholding money from Texas Crude and Texas Crude breached the agreements by withholding money from Hondo Oil and Gas. We affirm the finding that both Texas Crude and Atlantic Richfield breached the operating agreements, but we reverse the amount of damages Atlantic Richfield is ordered to pay Texas Crude and render a different amount.

---

[*]District Judge of the Eastern District of Louisiana, sitting by designation.

## I. FACTS

In 1962 and 1965, Texas Crude Operator, Inc. ("Texas Crude") and Atlantic Richfield Company ("ARCO") entered into three operating agreements for oil properties in Gaines County, Texas. Texas Crude was the operator, and ARCO was one of several non-operators. Amoco Production Company ("Amoco") was also a non-operator.[1]

Each operating agreement contains a standard form PASO–T–1955–2 Accounting Procedure ("PASO"). PASO is one method for allotting overhead expenses to the non-operators. The method provides for a fixed rate per well plus a portion of camp and district expenses allocated on a per well basis among the wells in the district.

In 1969, ARCO sent a letter announcing that it was switching to the Counsel of Petroleum Accounting Societies ("COPAS") method of accounting on all properties in which ARCO was the operator, and ARCO stated its willingness for other operators to switch to the COPAS method on properties in which ARCO was a non-operator. The COPAS accounting method establishes for overhead a fixed sum per well, known as the combined fixed rate ("CFR"), and adjusts the CFR annually on April 1 of each year based upon a referenced cost index. Texas Crude declined to change its accounting method in 1969.

By 1978, Texas Crude realized that it was failing to recover all of its overhead expenses. In 1977, for example, it had an aggregate overhead of approximately $500,000 but recovered only $89,000 from the non-operators. PASO calculated expenses from the field districts, but Texas Crude had transferred many of its costs to regional centers. PASO did not allocate expenses from the regional centers. Texas Crude, therefore, converted to the COPAS accounting method for the Gaines County fields on April 1, 1978. The conversion produced a change in the non-operators' monthly

---

[1]For simplicity's sake, we refer to all the parties by their current names, Texas Crude, ARCO, and Amoco, although in some circumstances, they are successors in interest to other companies.

overhead charges from approximately $175 per well to over $530 per well.

When Texas Crude converted to COPAS, it did not send notice to the non-operators nor did it seek their consent. An expert at trial, however, testified that ARCO knew about the switch. Texas Crude began using COPAS on April 1, 1978. April 1 is also the date on which COPAS CFRs are annually escalated. Operators and non-operators, therefore, observe April statements with some care. An ARCO accountant further testified that ARCO codes its bills when it receives them, and it uses a different code for COPAS and PASO. ARCO routinely computerizes these codes and tracks them in reports to management. Moreover, in October 1978, a member of ARCO's management complained to Texas Crude about the new rate on other properties. Texas Crude replied that the rate was less than the rate ARCO charged Texas Crude on properties in which ARCO was the operator and Texas Crude was the non-operator. After this initial inquiry, ARCO did not raise the issue again, and it paid the bills without incident for the next six years.

Amoco also noticed the change in its monthly charges, and it complained to Texas Crude. Amoco refused to pay the higher rate. Texas Crude had no other operations with Amoco, and it considered Amoco a "thorn in the side." Rather than fight with Amoco, Texas Crude decided to take the loss on Amoco just to have the problem go away. Texas Crude thus agreed to bill Amoco at a lower rate.

In 1984, after an Amoco audit, ARCO learned that Amoco's overhead rate was approximately half its overhead rate. ARCO attempted to negotiate a more favorable overhead rate, but when these negotiations were unsuccessful, it began to withhold amounts from its overhead payments as a means of recovering what it believed to be Texas Crude's overcharges. Texas Crude retaliated by withholding payments to ARCO on other properties in which ARCO was the operator and Texas Crude was the non-operator.

The parties stipulated that Texas Crude's alleged overcharges totaled $170,755.03—i.e. the difference between the rate Texas Crude charged ARCO and the rate it charged Amoco. ARCO retained this amount from its overhead payments.

Effective January 1, 1987, ARCO sold 2700 properties, including the properties involved in this suit, to Hondo Oil and Gas Company ("Hondo"). Hondo conducted a due diligence inquiry regarding the properties before closing, but it found no evidence of the audit dispute, and ARCO did not advise Hondo of the dispute.

Texas Crude began selling the production from these properties to Tesoro Crude Oil Company, and Texas Crude retained Hondo's share of the proceeds pursuant to an operators lien granted by the operating agreements. By August 1987, Texas Crude had suspended a sufficient sum to offset the money ARCO had retained.

When Hondo learned it was not receiving any revenues from the properties in question, it confronted Texas Crude. Attempted resolution of the dispute was unsuccessful, and Hondo filed suit against Texas Crude on September 13, 1989. Texas Crude filed a third party complaint against ARCO on January 2, 1990. After a bench trial, the district court held that ARCO breached the modified operating agreements by withholding payments but limited damages because of the statute of limitations. The district court limited Texas Crude's damages to $117,539.92 because of the statute of limitations. The court further held that Texas Crude also breached the operating agreements with Hondo by withholding Hondo's revenues and awarded Hondo $170,755.03 in damages. The court, however, held that Texas Crude did not breach the Texas Natural Resources Code. The court also ordered Texas Crude to pay Hondo $69,072.25 in attorney's fees. All parties appeal some portion of the district court's ruling.

## II. MODIFICATION

The central issue is whether Texas Crude and ARCO modified their original operating agreements. The district court held that ARCO's acceptance of Texas Crude's change to the COPAS accounting method modified the operating agreements. ARCO challenges the ruling claiming Texas Crude acted unilaterally and without ARCO's consent.

Parties are free to modify a contract by any manner in which they can make a contract. *Mid Plains Reeves, Inc. v. Farmland Industries, Inc.,* 768 S.W.2d 318, 321 (Tex.App.—El Paso 1989, writ denied). Texas law recognizes an implied contract in which the parties form a contract based upon their acts and conduct. *Bank of El Paso v. T.O. Stanley Boot Co., Inc.,* 809 S.W.2d 279, 284 (Tex.App.—El Paso 1991, writ granted) ("In an implied contract, mutual agreement must be inferred from the circumstances of the transaction"); *Emmer v. Phillips Petroleum Co.,* 668 S.W.2d 487, 490 (Tex.App.—Amarillo 1984, no writ) ("The absence of an express contract does not, however, foreclose the possibility of a contractual relationship, because the parties may, by their acts and conduct, create an implied contract.... In contracts implied in fact, the law finds a mutual intent to contract from the facts and circumstances of the case"). Texas Crude and ARCO, therefore, could modify the operating agreements with their conduct.

Whether the parties modified the operating agreement depends on the parties' intentions and is a question of fact. *Hathaway v. General Mills, Inc.,* 711 S.W.2d 227, 228–29 (Tex.1986). With respect to trials to the court without a jury, we review findings of fact under the clearly erroneous standard. Fed.R.Civ.P. 52(a); *Chandler v. City of Dallas,* 958 F.2d 85, 89 (5th Cir.1992).

The evidence at trial supports the court's finding that the parties modified the operating agreements. Although Texas Crude changed to COPAS unilaterally, ARCO knew of the change and apparently consented to it. ARCO's accounts coding indicated the change, and ARCO used the codes in its management reports. Texas Crude changed to COPAS on April 1, the date on which COPAS CFRs were annually escalated. At trial, an expert testified that non-operators routinely scrutinize

April statements with some care. Moreover, ARCO challenged the change to COPAS on a Louisiana well. Although the Louisiana well is not a well included in this dispute, it is relevant because Texas Crude sent all of the invoices under a single summary sheet. If ARCO noticed the change on the Louisiana well, it must have noticed the change on the Gaines County wells.

During the dispute Texas Crude informed ARCO that the rate Texas Crude was charging ARCO was less than the rate ARCO charged Texas Crude on other wells. After this fact was pointed out to ARCO, it paid the COPAS rate without objection for six years until it realized it was paying more than Amoco. With the foregoing evidence supporting its holding, the district court's ruling that the parties modified the operating agreement is not clearly erroneous.

ARCO and Hondo raise several issues related to the operating agreement's modification. ARCO first maintains any alleged modification violates the Statute of Frauds. Tex.Bus. & Com.C. § 26.01.[2] Modification does not violate the Statute of Frauds "[i]f neither the portion of the written

---

[2]"(a) A promise or agreement described in Subsection (b) of this section is not enforceable unless the promise or agreement, or a memorandum of it, is

    (1) in writing; and

    (2) signed by the person to be charged with the promise or agreement or by someone lawfully authorized to sign for him.

(b) Subsection (a) of this section applies to:

    (1) a promise by an executor or administrator to answer out of his own estate for any debt or damage due from his testator or intestate;

    (2) a promise by one person to answer for the debt, default, or miscarriage of another person;

    (3) an agreement made on consideration of marriage or on consideration of nonmarital conjugal cohabitation;

    (4) a contract for the sale of real estate;

    (5) a lease of real estate for a term longer than one year;

    (6) an agreement which is not to be performed within one year from the date of making the agreement;

contract affected by the subsequent modification, nor the matter encompassed by the modification itself is required by the Statute of Frauds to be in writing ..." *Joiner v. Elrod,* 716 S.W.2d 606, 610 (Tex.App.—Corpus Christi 1986, no writ), *quoting Garcia v. Karam,* 154 Tex. 240, 276 S.W.2d 255, 257 (1955).

Under Section 26.01, an operating agreement need not be in writing if it can be performed within one year. The operating agreements here involved can conceivably be performed within one year in accordance with the terms of the agreements. When oil production ceases, the operating agreements terminate. Because the agreements could conceivably be performed within one year, they do not need to be written. *Hardin Assoc., Inc. v. Brummett,* 613 S.W.2d 4, 7 (Tex.Civ.App.—Texarkana 1980, no writ) ("[W]here the time for performance is indefinite in that the agreement merely provides for the performance of a particular act or acts which can conceivably be performed within one year, the Statute of Frauds is inapplicable, however improbable performance within one year might be").

ARCO further asserts that an operator cannot charge different overhead rates to non-operators who have signed the same operating agreement. ARCO therefore believes it must be charged the same rate as Amoco. ARCO's argument is based upon contractual provisions stating

---

(7) a promise or agreement to pay a commission for the sale or purchase of:

      (A) an oil or gas mining lease;

      (B) an oil or gas royalty;

      (C) minerals;

      (D) a mineral interest;

(8) an agreement, promise, contract or warranty of cure relating to medical care or results thereof made by a physician or health care provider as defined in Section 1.03, Medical Liability and Insurance Improvement Act of Texas. This section shall not apply to pharmacists."

Tex.Bus. & Com.C. § 26.01.

parties will be charged their proportionate share of costs and expenses.

Although the non-operators signed the same operating agreements, they have no special relationship between them establishing any fiduciary duty. Testimony at trial established that it was not uncommon to charge different rates to different non-operators on the same well and that variations in rates are the product of negotiations. ARCO might have a legitimate claim of breach of contract if Texas Crude charged it a rate higher than its proportionate share, but no evidence was presented to support such a claim. The evidence only established that Amoco was charged a rate at less than its proportionate share. Essentially, Texas Crude decided it would take the loss from Amoco rather than fight with Amoco. Texas Crude's decision to take the loss on Amoco does not require it to take a similar loss on ARCO's overhead payments. Amoco and ARCO are different parties, and Texas Crude may consider different factors in determining whether to take a loss on either party.

The parties also dispute whether the modification of the operating agreements governs Hondo. Since Hondo took all of ARCO's rights under the operating agreements and ARCO modified the agreements, Hondo is subject to the COPAS procedure. *See McCormick v. Krueger,* 593 S.W.2d 729, 730–31 (Tex.Civ.App.—Houston [1st Dist.] 1979, writ ref'd n.r.e.) ("It is generally true ... that grantees and assignees become bound by the contractual obligations of their predecessors in title"); *Schultz v. Weaver,* 780 S.W.2d 323, 325 (Tex.App.—Austin 1989, no writ) ("Generally, the assuming party is liable to the same extent as the party from whom it assumed the contract").

## III. NATURAL RESOURCES CODE

Hondo alleges that Texas Crude's withholding of Hondo's payments violated Tex.Nat.Res.Code § 91.401 et seq.[3] The district court, however, expressly held that Texas Crude

---

[3]These sections were amended in 1991, but the parties are subject to the pre-amendment sections.

did not violate the Texas Natural Resources Code. Section 91.403(a) requires interest to be paid for late payments, but 91.403(b)(2) provides that interest does not have to be paid if "there is a reasonable doubt that the payee does not have clear title to the interest in the proceeds of payments." Essentially, Hondo asks us to hold that Texas Crude violated the Natural Resources Code so that Hondo can collect prejudgment interest.

The district court held that Texas Crude did not violate the Texas Natural Resources Code, but the court did not elaborate on its holding. We assume the court concluded that Texas Crude had a reasonable doubt whether Hondo was entitled to the proceeds. We agree with the conclusion. ARCO was withholding its payments from Texas Crude, and Texas Crude had an operator's lien on the proceeds. That we ultimately award damages to Hondo is inconsequential because Texas Crude acted reasonably at the time in questioning Hondo's right to the proceeds.

"[W]e have interpreted Texas law as allowing a prevailing party in either a contract or tort suit to recover prejudgment interest as a matter of *equity* in all but the most exceptional circumstances." *Campbell, Athey & Zukowski v. Thomasson,* 863 F.2d 398, 402 (5th Cir.1989) (emphasis in original). The present case illustrates one of the exceptional circumstances in which we do not require payment of prejudgment interest. The general must yield to the specific. It would be contradictory to rule that Texas Crude did not violate a statute allowing it to withhold payments without paying interest, and then require Texas Crude to pay prejudgment interest. We affirm the district court's ruling that Texas Crude did not violate the Texas Natural Resources Code and that Texas Crude need not pay prejudgment interest.

## IV. TEXAS CRUDE'S BREACH

The district court held that Texas Crude breached its operating agreements as to Hondo by withholding payments because ARCO was primarily liable for the pre-assignment liabilities. The evidence supports this conclusion. ARCO and Texas Crude continued negotiating the disputed

charges subsequent to ARCO's assignment to Hondo. Also, the bills originally sent to ARCO and then passed on to Hondo for review and payment do not show any past due amount for operating expenses. Moreover, in October 1987, Texas Crude informed Hondo that so long as Hondo continued to pay its operating expenses, Texas Crude would pay Hondo its revenues from the sale of the crude oil. Texas Crude failed to advise Hondo that Texas Crude intended to satisfy the $170,755.03 owed by ARCO out of Hondo's funds. Hondo relied upon this declaration and paid its share of operating expenses.

Based upon ARCO's primary liability on the debt and Texas Crude's assurances to Hondo, the quasi estoppel doctrine prohibits Texas Crude from withholding money from Hondo's revenues from the sale of the crude oil. "Quasi estoppel precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken by him. The doctrine applies when it would be unconscionable to allow a person to maintain a position inconsistent with one in which he acquiesced, or of which he accepted a benefit." *Vessels v. Anschutz Corp.,* 823 S.W.2d 762, 765–66 (Tex.App.—Texarkana 1992, writ denied).

Texas Crude's continual negotiations with ARCO combined with its promise of revenue payments to Hondo preclude Texas Crude from withholding Hondo's revenues. The district court's decision that ARCO breached the modified operating agreements augments the efficacy of this holding. Although we affirm the district court's order to Texas Crude to remit the $170,755.03 it withheld from Hondo, Texas Crude also receives judgment for the money ARCO improperly withheld from it.

## V. STATUTE OF LIMITATIONS

The district court required ARCO to pay Texas Crude $117,539.92 in damages. This figure represents the $170,755.03 the parties stipulated was at issue less a deduction of $53,215.11, which the court held the statute of limitations barred. Texas Crude does not contest the applicability of a

four-year statute of limitations,[4] but it does claim that even with a four-year statute of limitations, it should be able to recover the entire amount.

It is beyond dispute that Texas Crude filed its third party action against ARCO on January 2, 1990. The parties also do not dispute that ARCO withheld $53,215.11 prior to January 1, 1986, and it withheld $175,206.83 after January 1, 1986—i.e. the beginning of the four-year statute of limitations. The district court deducted the amount withheld prior to 1986 from Texas Crude's damages, but Texas Crude contends that since the amount withheld during the statutory period, $175,206.83, was greater than the amount of stipulated damages, $170,755.03, it should receive the entire damages amount.[5]

"Where a contract provides for monthly payments and not a present sale of gas or oil, a cause of action accrues when any given monthly payment is due. Only those payments due more than four years before the suit was filed are barred." *Western Oil Fields, Inc. v. Pennzoil United, Inc.,* 421 F.2d 387, 390 (5th Cir.1970); *see also, Gabriel v. Alhabbal,* 618 S.W.2d 894, 897 (Tex.Civ.App.—Houston [1st Dist.] 1981, writ ref'd n.r.e.) ("When recovery is sought on a note or other obligation payable in installments the Statute of Limitations runs against each installment from the time it becomes due, that is from the time when action might be brought to recover it"). Texas Crude thus was entitled to sue for payment of all amounts withheld after January 1, 1986. The amounts withheld after January 1, 1986 is greater than the stipulated damages amount. We, therefore, reverse the district court and render judgment against ARCO in Texas Crude's favor in the amount of $170,755.03, the full amount of stipulated damages.

## VI. ATTORNEYS' FEES

[4]Texas has established a four-year statute of limitations for all actions related to a debt. Tex.Civ.Prac. & Rem.Ann. § 16.004(a)(3).

[5]The parties do not explain why ARCO withheld $175,206.83 but the stipulated damages are only $170,755.03.

Texas Crude appeals the district court's award of $69,072.25 in attorneys' fees to Hondo. We review an award of attorneys' fees under an abuse of discretion standard. *Cates v. Sears, Roebuck & Co.,* 928 F.2d 679, 689 (5th Cir.1991). Texas Crude maintains that ARCO's breach of the operating agreements caused any breach by Texas Crude of the agreements with Hondo. Texas Crude concludes, therefore, that it should recover the amount of Hondo's attorneys' fees from ARCO.

Texas Crude essentially petitions us to require ARCO to indemnify it. The right to indemnity generally arises from either an express or implied contract. *UMC Inc. v. Coonrod Electric Co., Inc.,* 667 S.W.2d 549, 554 (Tex.App.—Corpus Christi 1983, writ ref'd n.r.e.). The present case does not involve an express contract of indemnity, and, therefore, Texas Crude must establish an implied contract of indemnity. An implied contract arises in favor of a person who acted without fault but who must pay damages caused by another party. *Id.* In contractual relationships, courts recognize an implied right of indemnification when an agency or surety relationship exists. *American Alloy Steel, Inc. v. Armco, Inc.,* 777 S.W.2d 173, 175 (Tex.App.—Houston [14th Dist.] 1989, no writ).

Because Texas Crude breached the operating agreement with Hondo, the district court did not abuse its discretion in granting attorneys' fees to Hondo. Moreover, the court did not abuse its discretion in refusing to compel ARCO to indemnify Texas Crude. Texas Crude and ARCO had neither an agency nor a surety relationship, and Texas Crude cannot claim ARCO was wholly at fault in causing Hondo's damages. Thus, no implied contract of indemnification existed between ARCO and Texas Crude.

## VII. CONCLUSION

The district court correctly held that: (1) ARCO breached the modified operating agreements; (2) Texas Crude did not breach the Texas Natural Resources Code; and (3) Texas Crude did breach the operating agreements with Hondo. The court also did not abuse its discretion in awarding attorneys' fees. The district court, however, erred when it limited the award from ARCO to Texas

Crude based upon the statute of limitations.  We, therefore, reverse Texas Crude's damages and render an award of $170,755.03 against ARCO.

AFFIRMED IN PART;  REVERSED AND RENDERED IN PART.