

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-10-00365-CV

ARCH REINSURANCE COMPANY                                          APPELLANT

V.

UNDERWRITERS SERVICE                                                  APPELLEE
AGENCY, INC.

----------

## FROM THE 48TH DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

This appeal arises out of a dispute over a contract among three parties—State National (not involved in this appeal), Appellant Arch Reinsurance Company, and Appellee Underwriters Service Agency, Inc.—and a subsequent modification of that contract negotiated by representatives of Arch and Underwriters. In thirteen issues, Arch argues that the contract could not be

---

[1]*See* Tex. R. App. P. 47.4.

modified without State National's consent; that the evidence is insufficient to support the jury's finding that Arch agreed to the modification; that the jury's findings that Arch agreed to modify the contract were immaterial; that the modification violated the contract's prohibition against assignments; that Underwriters's estoppel defense failed as a matter of law; that the jury's finding against Underwriters's in one of the equitable estoppel questions in the charge defeated Underwriters's estoppel defense; that the jury's finding in favor of Underwriters on equitable estoppel in another question was immaterial; that the trial court erred by excluding evidence about why State National did not consent to the modification; that lack of consideration rendered the modification invalid; that the modification was not retroactive; that the trial court erred by granting summary judgment on Arch's fraudulent inducement claims; that the trial court erred by awarding attorney's fees to Underwriters; and that Arch is entitled to an award of attorney's fees as a matter of law. Because we hold that the trial court abused its discretion by awarding attorney's fees to Underwriters, we modify the trial court's judgment to omit that award. Because we hold that State National's consent was not required for the modification and that the trial court did not err by granting summary judgment on Arch's fraud claims, we affirm the remainder of the trial court's judgment.

2

**Background**

*The Agreement*

State National issues insurance policies, Underwriters sells insurance policies, and Arch provides reinsurance coverage.[2] These three parties entered into a Quota Share and Reinsurance Agreement (reinsurance agreement), as well as a general agency agreement (agency agreement), which was attached to and referenced by the reinsurance agreement. Under these agreements, Underwriters sold (and collected the premiums on) homeowner policies issued by State National, and Arch agreed to reinsure State National for one hundred percent of the risk associated with the policies. Underwriters turned the premiums over to Arch, receiving a commission on these premiums.

The agreement provided that Underwriters would receive a thirty percent commission on the premiums it collected, but only provisionally, and this provisional commission would be adjusted depending on the amount of losses taken on the policies. If, at the end of the year, Arch suffered fewer losses than expected compared to premiums earned, Arch would pay Underwriters an additional percentage on a sliding scale, up to an additional three-and-a-half percent. If, on the other hand, losses were higher than expected, Underwriters

---

[2]*See Gamma Grp., Inc. v. Transatlantic Reinsurance Co.*, 242 S.W.3d 203, 205 n.1 (Tex. App.—Dallas 2007, pet. denied) ("'Reinsurance'" is a means whereby a company that issues an insurance policy can allocate or 'cede' a portion of the risk it bears on that policy to another insurance company in return for a portion of the premium.").

had to return to Arch up to three percent of the commissions it had received, so that Underwriters received only a twenty-seven percent commission.

Within forty-five days after the end of each month, Underwriters was required to remit to Arch the ceded net premiums during that month, less Underwriters's commission and certain deductions. Arch was required to provide a report to State National that included the amount of the commission paid to Underwriters, and this report was required to be furnished within forty-five days of the close of the month.

The agreement contained a provision that neither Arch nor Underwriters could assign any of its rights or obligations under the agreement without prior written consent of State National. It further provided that the agreement could be amended or modified only by a written agreement executed by all the parties.

*The Dispute*

In 2007, Phil Glick, a property underwriter employed by Arch, had discussions with representatives of Underwriters about Underwriters's desire to modify the reinsurance agreement. Underwriters requested that Arch agree to increase Underwriters's minimum commission from twenty-seven percent to thirty percent. On December 11, 2007, Glick and a representative from Underwriters signed a document, Addendum No. 11, to modify the reinsurance agreement. The addendum provided that "[e]ffective as of March 1, 2007, and pertaining to all liabilities that are applicable to [the reinsurance agreement], the loss and loss adjustment expense are capped" per a scale set out in the addendum. This

4

scale capped Arch's losses for certain years at specified amounts. The addendum also amended paragraph 8.06 of the reinsurance agreement, the provision that provided the adjusted commission rate used to determine the amount of Underwriters's commission. This amendment raised Underwriters's minimum commission to thirty percent, as had been requested by Underwriters.

On December 14, 2007, three days after signing Addendum No. 11, Glick emailed his resignation to John Rathgeber, chairman of Arch, stating among other things that "[b]ecause of the problems with the . . . . [State National] contracts I feel as if my job performance has not been acceptable to myself." When Rathgeber met with Glick to discuss the email, he learned about Glick's execution of Addendum No. 11. Shortly after that, Rathgeber contacted representatives with both Underwriters and State National and stated that Arch did not agree to the addendum and that Glick was not authorized to agree to it. State National had not reviewed or signed the addendum.

*The Lawsuit*

In 2008, Arch filed suit against Underwriters for breach of contract and for declaratory relief. Arch alleged that for the agreement years 2003 through 2006, Underwriters did not furnish reports to Arch and did not return commissions that Arch was owed. Through amended petitions, Arch also challenged Addendum No. 11 on fraudulent inducement grounds.

Underwriters filed a combined traditional and no-evidence motion for summary judgment on the fraudulent inducement claims. Among other grounds,

5

Underwriters alleged that Arch's fraud claims were barred by the economic loss rule and that there was no evidence of the elements of fraud. In a separate motion, Underwriters also sought summary judgment on the issue of whether Glick had apparent authority to act on Arch's behalf with respect to Addendum No. 11. The trial court granted these motions without specifying the grounds. The breach of contract claim then proceeded to a jury trial.

David Cleff, a representative of State National, testified at trial that he had not approved Addendum No. 11 and that no one at State National with authority to approve it had done so. He further testified that no one at Arch had prevented him from approving Addendum No. 11. But he then stated that after the addendum had been given to him to review but before he had a chance to review it, "the broker contacted State National and said that we didn't need to look at it." He stated that he subsequently reviewed Addendum No. 11 and that State National did not agree to it. When asked why State National did not agree to it, Underwriters objected on the ground that any opinions "formed after the fact" were irrelevant. The trial court sustained the objection. Underwriters also objected on hearsay grounds when the State National representative was asked if anyone had ever asked whether the changes in the addendum were acceptable to State National, and the trial court sustained the objection.

Rathgeber also testified. When asked if he had asked representatives of State National not to sign Addendum No. 11, he answered that he had asked them if they were aware of the addendum and whether they agreed with it, and

6

"[a]fter they explained their knowledge of the situation and their knowledge of the endorsement, I did ask if they could please not execute it while we try to work things out with [Underwriters]."

In question one part A of the jury charge, the jury was asked if it found that Arch agreed to modify the agreement in 2007 to excuse Underwriters's liability for return commissions for each agreement year. The jury answered "yes." In part B of question one, the jury was asked if Arch agreed to modify the agreement in 2007 to revise Underwriters's minimum commission to thirty percent for each agreement year. The jury again answered "yes."

Question two of the charge was also a two-part question. The question asked whether the jury found that Arch was equitably estopped from denying the 2007 modifications to the agreement on the grounds that State National did not agree to Addendum No. 11. Part A asked whether the jury found estoppel because "State National's failure to sign Addendum No. 11 was caused by Arch's actions." The jury answered "yes" to this part of the question. In part B, the charge set out the elements of equitable estoppel (that is, that Arch made a false representation or concealed material facts with the intention that Underwriters would rely on the representation and that Underwriters relied to its detriment).[3] The jury answered "no" to this part of the question.

---

[3]*See Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 515–16 (Tex. 1998) (setting out the elements of equitable estoppel).

The trial court entered a final judgment ordering that Arch take nothing on its claims and that Underwriters recover attorney's fees under section 37.009 of the civil practice and remedies code[4] in the amount of $443,760, plus additional contingent appellate attorney's fees.

## Analysis

**Is any modification to the reinsurance agreement invalid as a matter of law for want of State National's consent?**

Arch argues in its first issue that any modification of the reinsurance agreement, whether by Addendum No. 11 or any other communications between Arch and Underwriters, was invalid as a matter of law without State National's consent. The question of whether parties to an agreement intended to modify their agreement is a question of fact.[5] In this case, the jury found that Arch and Underwriters agreed to modify the reinsurance agreement.

Arch maintains first that the plain language of the reinsurance agreement requires that all three parties agree to any amendment. Arch also argues that Addendum No. 11, which Underwriters drafted, recognizes the need for all three parties to agree. Arch further argues that Texas law requires all parties to a contract to agree to any modification of the contract and that two parties to a three-party agreement cannot modify the agreement when the modification

---

[4]Tex. Civ. Prac. & Rem. Code Ann. § 37.009 (West 2008).

[5]*San Antonio Mach. & Supply Co. v. Allen*, 268 S.W. 532, 533 (Tex. Civ. App.—San Antonio 1925, no writ).

affects the third party. Arch then argues that Addendum No. 11 has a substantial impact on State National and that it therefore required State National's consent to be valid.

Addendum No. 11 stated that it was entered into among Arch, Underwriters, and State National, but as Arch points out, State National never agreed to this addendum. The addendum stated that State National "agreed to cut-off the 2006 term effective February 28, 2007, and transfer the Unearned Premium Reserve of $5,404,779 to the 2007 term." Because State National did not agree to the addendum, it cannot be bound by this language.[6] But Underwriters maintains that the remainder of the addendum is enforceable even without State National's consent because it had no substantial effect on State National.

Arch counters Underwriters's argument by asserting that Addendum No. 11 did have a substantial impact on State National. The addendum modified the reinsurance agreement by changing the provision under which Arch was liable for one hundred percent of the losses incurred in connection with the risks covered by the agreement to one in which Arch's liability was capped. Arch

---

[6]*See Mandril v. Kasishke*, 620 S.W.2d 238, 244 (Tex. Civ. App.—Amarillo 1981, writ ref'd n.r.e.) (stating that for contract modification, there must be a meeting of the minds of the parties and that the terms of the original contract cannot be unilaterally remade by one of the parties). Underwriters also cites a federal case, *Hondo Oil & Gas Co. v. Tex. Crude Operator, Inc.*, 970 F.2d 1433 (5th Cir. 1992), but the facts and contractual relationship in that case differ from the facts and the contractual relationship at issue in this case so as to make that case not directly on point.

contends that because Addendum No. 11 caps Arch's liability to cover losses, it would leave State National unreinsured for losses that exceeded the caps.

Underwriters argues, however, that even with the execution of Addendum No. 11, State National was fully indemnified against any adverse effect. It points to a provision of the agency agreement in which Underwriters agreed to indemnify and hold State National harmless

> from and against any and all actions, causes of actions, suits, arbitrations, or proceedings of any kind, liabilities, losses, claims, damages, costs, or expenses . . . incurred by [State National] by reason of, arising out of, or relating in any way to this [general agency agreement] or any action taken or inaction by [Underwriters] in breach of the terms of this [a]greement or the terms of the Reinsurance Agreement.

The agency agreement further provided that "[i]f [Underwriters] does not indemnify and hold [State National] harmless . . . [Arch] shall fulfill the obligations of [Underwriters] and make the payments required" and that, conversely, "if [Arch] does not indemnify and hold [State National] harmless as required by the [r]einsurance [a]greement, [Underwriters] shall fulfill the obligations of [Arch] and make the payments required pursuant to the [r]einsurance [a]greement."

Arch argues that to the extent that Underwriters claims that the amendment transfers liability for losses over the caps to Underwriters, the plain terms of the addendum contradict Underwriters's interpretation of the amendment. Arch further argues that even if Underwriters's reading of the addendum were correct, State National's risk is still affected because State

10

National selected Arch to be its reinsurer, not Underwriters, and the shifting of liability would rewrite the benefits and risks bargained for by State National.

Although the only case on point that Underwriters cites is from Wisconsin,[7] we agree that if the modification of the reinsurance agreement via Addendum No. 11 did not affect State National, then Addendum No. 11 was a valid modification of the reinsurance agreement even without State National's consent. We therefore consider whether Arch is correct that the modification adversely affected State National.

The reinsurance agreement provided that "[i]t is understood that the [parties] hereto wish to enter into a reinsurance arrangement through which [State National] is to bear no business, credit[,] or insurance risk whatsoever (*save the risk of [Arch's] insolvency*)" and that "[a]ll provisions of this [reinsurance agreement] shall be interpreted so as to be in accord with this" part of the agreement. [Emphasis added.] Under the agreement, State National ceded to Arch, and Arch was required to accept, all of State National's gross liability under all policies issued by Underwriters in Oklahoma on behalf of State National during the term of the agreement.

---

[7]*See Lakeshore Commercial Fin. Corp. v. Drobac*, 319 N.W.2d 839, 840 (Wisc. 1982) (holding that with respect to a multi-party contract, when some but not all of the original signatories execute a modification to the contract, those signatories "can validly alter the contract in respect to each other, but that they cannot change the rights or obligations under the contract of an original signatory who did not join in the modification").

Thus, the purpose of the agreement was to arrange for policies to be issued in Oklahoma in State National's name and for State National to incur no risk from the issuance of these policies—except for the risk that Arch would become insolvent. To that end, the agreement provided that it terminated immediately upon written notice by State National if Arch was found to be insolvent or was placed in "supervision, conservation, rehabilitation, or liquidation, or has a receiver or supervisor appointed." State National could also immediately terminate the agreement as to Underwriters on the same grounds.

The reinsurance agreement further stated that Arch "shall assume and be liable for and pay on behalf of [State National], 100% of all losses incurred in connection with the risks covered by" the reinsurance agreement. Article VIII of the agreement provided that "[i]n consideration of the acceptance by [Arch] of *one hundred percent (100%) of [State National's] liability* on Insurance business reinsured hereunder, [Arch] is entitled to one hundred percent (100%) of the Net Premiums . . . received by [Underwriters] or [Arch] on Policies reinsured," less certain deductions. [Emphasis added.] The agreement also provided that Underwriters and Arch could not assign any of their rights or obligations under the agreement without State National's consent and that the agreement could be amended or modified only by a written instrument executed by all of the parties.

Although under the agreement State National ceded to Arch all of State National's liability under all policies issued under the agreement, Arch agreed to indemnify State National for all risks from the policies, and the parties agreed that

12

State National would incur no risk under the agreement save the risk of Arch's insolvency, nothing in the agreement expressly gave State National control over the business relationship between Arch and Underwriters. And other provisions in the reinsurance agreement show that State National distanced itself from the business relationship between Arch and Underwriters. Arch promised not to try to recover from State National any return commissions that Underwriters owed Arch but had failed to pay, and Underwriters promised not to seek from State National any commissions that it was owed by Arch. And in Article XVIII of the reinsurance agreement, the parties agreed that while for regulatory purposes, Underwriters would need to be appointed as the agent of State National, the parties were expressly recognizing that Underwriters was actually acting on behalf of Arch. The agreement stated that State National "is making no evaluation of [Underwriters's] qualification" and that it had "no obligation to furnish reports or statistics to [Arch], or to monitor the performance of [Underwriters]."

Arch is correct that in the reinsurance agreement, the parties agreed that State National's only risk would be Arch's insolvency. And Cleff testified that he did not think Addendum No. 11 was clear about which party would be required to pay the amount over the caps, "which is a significant digression from the agreements as they would currently stand, which has Arch paying them." He also stated that the addendum was therefore "a problem for State National" because "the whole basis of our transaction is that Arch is responsible for paying

13

those losses." He also testified that State National spends "a great deal of energy and resources making sure that the reinsurer . . . has the financial wherewithal to meet . . . the policy obligations."

But examination of the addendum leads to the conclusion that although the addendum reallocated the risk of loss, it did not shift any of that risk back to State National. The addendum did not specify whether Underwriters was assuming liability for any losses above the specified caps or whether Underwriters and Arch hoped to obtain State National's consent to release both parties from any liability for such losses. But because the parties could not bind State National to the amendment without its consent and because State National's execution of the reinsurance agreement was premised on its avoidance of all risk except the risk of Arch's insolvency, the reasonable construction of the addendum is that it requires Underwriters to hold Arch harmless for any liability over the caps.[8] Without State National's consent to the addendum, State National could still hold Arch liable for all of the losses per the original terms of the reinsurance agreement. But in that case, then under our construction of the addendum's terms, Underwriters would owe Arch for any amount over the caps that Arch had to pay to State National. Thus, State National's risk was covered. Arch would

_____

[8]See *7979 Airport Garage, L.L.C. v. Dollar Rent A Car Sys., Inc.*, 245 S.W.3d 488, 500 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) ("We construe a contract by determining how the 'reasonable person' would have used and understood its language, considering the circumstances surrounding the contract's negotiation and keeping in mind the purposes intended to be accomplished by the parties when entering into the contract.").

cover State National's losses, and Underwriters would reimburse Arch. Arch and Underwriters were free to agree to split the loss liability between them.

We acknowledge that the general agency agreement contains the following provision:

> Notwithstanding any provisions to the contrary contained elsewhere herein or in any other document, it is expressly understood that the execution and delivery of this [agency agreement] and [State National's] performance hereunder shall not under any circumstances be interpreted to affect, weaken[,] or modify [Arch's] obligation to indemnify and hold [State National] harmless from and against the . . . risks as set forth in the [r]einsurance [a]greement. The contractual assumption by [Arch] of these risks . . . is a condition precedent to [State National's] entering into this Agreement with [Underwriters].

But as we have stated, Addendum No. 11 did not shift any risk of loss back to State National. And, under both the reinsurance agreement and general agency agreement, State National could hold Arch liable for one hundred percent of any losses notwithstanding the addendum's attempt to cap Arch's losses. Under our construction of Addendum No. 11, Arch could recover from Underwriters any over-the-cap losses that Arch owed to State National. Thus, as stated above, although Arch and Underwriters agreed in the reinsurance agreement and general agency agreement that Arch would bear one hundred percent of the risk of loss, State National was not adversely affected by Addendum No. 11 because State National retained its right under the reinsurance agreement and the general agency agreement to have Arch cover all of its risk.

15

We hold that because Addendum No. 11 did not have a substantial impact on State National, State National's consent was therefore not necessary to modify the agreement as between Arch and Underwriters.[9] We overrule Arch's first issue.

**Does Addendum No. 11 violate the reinsurance agreement's prohibition against assignments?**

The second issue raised by Arch is whether Addendum No. 11 (or any other alleged amendment) would violate the reinsurance agreement's prohibition against assignments were it to be construed as requiring Underwriters to pay amounts in excess of the caps. Arch argues that such a construction would, as a matter of law, violate the agreement's anti-assignment provision, which prohibits assignment of any of the rights or obligations under the agreement without State National's consent.

Under our construction of Addendum No. 11, the addendum did not assign away any of State National's rights. Nor did it assign to Underwriters Arch's duty under the reinsurance agreement to indemnify State National for one hundred percent of State National's losses. It merely gave Arch the right to recover from Underwriters any amount over a cap that it was required to pay to State National. Furthermore, notwithstanding the anti-assignment language, parties may choose

---

[9]*See Drobac*, 319 N.W.2d at 840.

16

to modify contractual obligations,[10] and because the modification did not substantially affect State National's rights or obligations under the contract, its consent was not necessary.[11] We overrule Arch's second issue.

**Were the jury's findings on questions 1A and 1B immaterial?**

Arch asks in its third issue whether the jury's findings to questions 1A and 1B are legally immaterial, especially given that the relevant inquiry was whether all three parties agreed to modify the reinsurance agreement and that there was no evidence that State National had agreed to a modification. Question number one part A asked whether Arch had agreed to modify the reinsurance agreement in 2007 to excuse Underwriters's liability for return commissions for each agreement year, and part B asked whether Arch had agreed to revise Underwriter's minimum commission to thirty percent for each agreement year. The jury answered "yes" to both parts of the question.

Arch argues that because all three parties had to agree to Addendum No. 11 (or any other modification), it was legally immaterial whether Arch and Underwriters alone had agreed to it. Because we have held that State National's consent was not required for the modifications that the jury was asked about, we overrule Arch's third issue.

---

[10]*See Berkman v. D.M. Oberman Mfg. Co.*, 230 S.W. 838, 841 (Tex. Civ. App.—Austin 1921, writ dism'd w.o.j.) (noting that any of the terms or conditions of a contract may be modified by agreement of the parties).

[11]*See Drobac*, 319 N.W.2d at 840.

17

**Was the evidence insufficient to support the jury's answers to questions 1A and 1B?**

Arch's fourth issue asks whether the evidence is legally and factually insufficient to support the jury's answers to questions 1A and 1B. Arch argues that even if questions 1A and 1B were not immaterial, the evidence was insufficient to support the jury's answers to them.

Arch's argument under this issue is based on State National's failure to consent to Addendum No. 11. It argues that it had withdrawn its agreement to Addendum No. 11 before State National even considered the addendum, that State National never agreed to the addendum, and that, therefore, Addendum No. 11 never became effective. Because we have held that State National's consent was not required in order for Arch and Underwriters to modify the reinsurance agreement as between themselves, we overrule this argument. We therefore do not address Underwriters's counterarguments that Arch could not revoke its acceptance because it has already begun performing under the modified agreement or that Arch waived its revocation-of-acceptance argument. Because we have held that Addendum No. 11 was an effective modification of the reinsurance agreement, we also do not reach Arch's argument that no other communications between it and Underwriters served to modify the reinsurance agreement, and we overrule Arch's fourth issue.[12]

---

[12] *See* Tex. R. App. P. 47.1.

**Did Underwriters fail to establish its equitable estoppel defense?**

Arch's fifth, sixth, seventh, and eighth issues address Underwriters's defense of equitable estoppel in which Underwriters had asserted that Arch was estopped from arguing that the addendum was invalid because State National had not consented to it. Because we have held that State National's consent was unnecessary, we need not address these issues.[13]

**Is Addendum No. 11 unenforceable for lack of consideration?**

Arch's ninth issue is whether Addendum No. 11 can be enforced between Underwriters and Arch when it lacks consideration.[14] Generally, what constitutes consideration is a question of law.[15] We therefore review Addendum No. 11 de novo to determine whether it provides consideration to modify the reinsurance agreement.

---

[13]*See id.*

[14]*See Arthur J. Gallagher & Co. v. Dieterich*, 270 S.W.3d 695, 702 (Tex. App.—Dallas 2008, no pet.) (stating that a contract modification requires "a meeting of the minds supported by consideration" and that consideration "may consist of a benefit that accrues to one party or a detriment incurred by the other party"); *see also Frequent Flyer Depot, Inc. v. Am. Airlines, Inc.*, 281 S.W.3d 215, 224 (Tex. App.—Fort Worth 2009, pet. denied) ("Consideration may consist of either benefits or detriments to the contracting parties; it may consist of some right, interest, profit, or benefit that accrues to one party, or alternatively, of some forbearance, loss, or responsibility that is undertaken or incurred by the other party").

[15]*See Colligan v. Smith*, 366 S.W.2d 816, 818 (Tex. Civ. App.—Fort Worth 1963, writ ref'd n.r.e.) (providing that whether contract was void and unenforceable for lack of consideration was a question of law); *Brownwood Ross Co. v. Maverick Cnty.*, 936 S.W.2d 42, 45 (Tex. App.—San Antonio 1996, writ denied).

Arch argues that the only real potential benefit it could have received from Addendum No. 11 was the cap on Arch's liability to State National for 2002 through 2005, which would allow Arch to reduce its reserves. Arch then argues that this liability cap was a benefit that Arch did not receive and could not have received because State National did not agree to relieve Arch of liability and could not have been compelled to do so. Arch contends that because State National did not agree to cap Arch's liability as provided in the addendum, the addendum lacked consideration, making it unenforceable.

Although Arch was not released from its obligation to indemnify State National, Arch gained the right to be reimbursed from Arch for amounts over the cap. We therefore disagree with Arch that the liability cap was a benefit that Arch did not and could not receive.[16] Because this benefit constituted sufficient consideration, we need not consider Arch's argument that the addendum's reduction of the maximum commission it would have to pay was not consideration for the agreement.[17] We overrule Arch's ninth issue.

**Is Addendum No. 11 retroactive?**

Arch asks under its tenth issue whether Addendum No. 11, if valid, is not retroactive as a matter of law, such that the addendum cannot excuse amounts owed by Underwriters prior to the addendum's effective date. Arch's position is

---

[16]*See Frequent Flyer Depot*, 281 S.W.3d at 224; *Dieterich*, 270 S.W.3d at 702.

[17]*See* Tex. R. App. P. 47.1.

20

that even if the addendum were valid, it would not apply retroactively to forgive the commissions Underwriters owed to Arch for the agreement years 2003 through 2006 because the addendum has no language showing an intent to discharge the $1,374,972 in adjusted commissions that were owed for the years ending before March 1, 2007, the effective date of the addendum. Arch argues that, accordingly, the trial court committed reversible error by failing to render judgment in Arch's favor for $1,374,972 for the return commissions due under the reinsurance agreement.

We construe Addendum No. 11 as a matter of law to determine whether it applies retroactively.[18] As discussed above, the addendum states, "Effective as of March 1, 2007, and pertaining to all liabilities that are applicable to [the reinsurance agreement], the loss and loss adjustment expense are capped" per the scale set out in the addendum. The addendum also modified section 8.06(a) of the reinsurance agreement by replacing the method for calculating the adjusted commission rate with a new method, one that would entitle Underwriters to a minimum thirty percent commission. The new section 8.06(a) stated that it "applied to ceded premiums earned for the Agreement Year under consideration."

---

[18]*See Praeger v. Wilson*, 721 S.W.2d 597, 600 (Tex. App.—Fort Worth 1986, writ ref'd n.r.e.) (stating that where neither party has alleged that a contract is ambiguous, construction of the contract is a question of law for the court).

Arch argues that an amendment to a contract does not discharge obligations that exist under the contract unless there is express language evidencing such an intent.[19]  And Arch is correct that the addendum does not expressly state that it should be applied retroactively.  But Addendum No. 11 modified the reinsurance agreement to provide a new method for calculating the "ceded premiums earned for the Agreement Year under consideration."  Thus, anytime after the effective date of the modification, when Underwriters calculated the ceded premium for any particular agreement year for which it had not already done so, it would use the new formula.

Furthermore, to the extent that the language of the addendum was ambiguous as to whether Arch and Underwriters intended to discharge any return commissions owed by Underwriters, the jury specifically found that Arch had agreed to modify the reinsurance agreement to excuse Underwriters's liability to return commissions for each agreement year.[20]  The jury's answer is supported not only by evidence at trial that the parties understood that the addendum would have retroactive effect, but also by the fact that under the

---

[19]*See Millennium Petrochemicals, Inc. v. Brown & Root Holdings, Inc.*, 390 F.3d 336, 342 (5th Cir. 2004) ("Texas courts have made clear that rights or obligations that may have vested or accrued under previous versions of a contract can only be modified or extinguished through the inclusion of express language that manifests such intent.").

[20]*Phila. Am. Life Ins. Co. v. Turner*, 131 S.W.3d 576, 588 (Tex. App.—Fort Worth 2004, no pet.) (noting that if a contract is ambiguous, the intentions of the parties becomes a fact question for the jury).

reinsurance agreement's termination provisions, Arch had the right to terminate the agreement after thirty days' written notice to Underwriters if Underwriters failed to pay to Arch all payments of premiums due, and it opted not to do so despite the fact that Underwriters had not paid all of the premiums due for several years. We overrule Arch's tenth issue.

**Was Underwriters entitled to summary judgment on Arch's fraudulent inducement claim?**

In its eleventh issue, Arch asks whether the trial court erred by granting Underwriters's motion for summary judgment on Arch's fraudulent inducement claim and whether the trial court abused its discretion by denying Arch's motions to compel. We review a summary judgment de novo.[21] We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could and disregarding evidence contrary to the nonmovant unless reasonable jurors could not.[22] We indulge every reasonable inference and resolve any doubts in the nonmovant's

---

[21] *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010).

[22] *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009).

favor.[23]  A defendant who conclusively negates at least one essential element of a cause of action is entitled to summary judgment on that claim.[24]

After an adequate time for discovery, the party without the burden of proof may, without presenting evidence, move for summary judgment on the ground that there is no evidence to support an essential element of the nonmovant's claim or defense.[25]  The motion must specifically state the elements for which there is no evidence.[26]  The trial court must grant the motion unless the nonmovant produces summary judgment evidence that raises a genuine issue of material fact.[27]

When a party moves for both a traditional and a no-evidence summary judgment, we generally first review the trial court's summary judgment under no-evidence standards.[28]  When the trial court does not specify the basis for its summary judgment, the appealing party must show it is error to base it on any

---

[23] *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008).

[24] *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010); *see* Tex. R. Civ. P. 166a(b), (c).

[25] Tex. R. Civ. P. 166a(i).

[26] *Id.*; *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009).

[27] *See* Tex. R. Civ. P. 166a(i) & cmt.; *Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008).

[28] *See Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004); *All Am. Tel., Inc. v. USLD Commc'ns, Inc.*, 291 S.W.3d 518, 526 (Tex. App.—Fort Worth 2009, pet. denied). [29] *Star–Telegram, Inc. v. Doe*, 915 S.W.2d 471, 473 (Tex. 1995) (citations omitted).

ground asserted in the motion, and this court must affirm the summary judgment if any one of the movant's theories has merit.[29]

*Fraudulent Inducement By Non-Disclosure*.

Arch argues that the trial court erred by granting summary judgment on its fraud claims. Arch alleged in the trial court that Underwriters fraudulently induced it to enter into Addendum No. 11, both by failing to disclose information it had a duty to disclose and by making an affirmative misrepresentation. Underwriters moved for traditional and no-evidence summary judgment on Arch's fraud claims. In its no-evidence motion, Underwriters argued that there was no evidence on the elements of fraudulent inducement, including the element of reliance. The trial court granted summary judgment without specifying the grounds on which it based its ruling.[30]

On appeal, regarding its claim for fraudulent inducement by nondisclosure, Arch argues that (1) the trial court should have applied Oklahoma law rather than Texas law, (2) Underwriters had a duty to disclose to Arch the amount of return commissions owed to Arch but failed to so, and (3) Arch relied on Underwriters's nondisclosure.

In its response to Underwriters's summary judgment motion, Arch pointed to excerpts from two affidavits to show that Arch had relied on Underwriters's

---

[29]*Star–Telegram, Inc. v. Doe*, 915 S.W.2d 471, 473 (Tex. 1995) (citations omitted).

[30]*See id.*

failure to disclose the amount of return commissions owed to Arch. The first excerpt was from the affidavit of Joseph King, who from late 2001 through March 2006 was the head of the property underwriting department at Arch. King stated that he would never have recommended renewal of the reinsurance agreement in 2006 to Arch's management had Underwriters advised Arch that Underwriters owed Arch "a significant amount of return commissions that it had failed to report or pay when due and had no intention of paying." The second excerpt was from the affidavit of Douglas Morrison, who served as the head of the property underwriting department after King left Arch. In the part of the affidavit relied on by Arch, Morrison stated, "Had I known that [Underwriters] was withholding material information from [Arch] in breach of its obligations, [Arch] would not have approved any continuation of [Arch's] relationship with [Underwriters] into the 2007 agreement year." Arch argued in its response that this testimony shows that "[i]f [Underwriters] had provided [Arch] with just one of the commission-adjustment reports it had prepared between 2005 and 2007, [Arch] would have demanded payment, absent which it would have ended the parties' relationship."

Arch argues that these excerpts show that Arch would not have continued dealing with Underwriters if Underwriters had disclosed the amount of return commissions due to Arch. But the fraudulent inducement claim was aimed at rescission of Addendum No. 11. None of the evidence relied on by Arch came from Glick, the Arch representative who executed Addendum No. 11 on behalf of Arch, or from any other Arch representative who was involved in the negotiations.

26

The statements contain mere speculation about what Arch might have done prior to Glick's execution of Addendum No. 11 if it had had the information provided to it. They do not show that anyone at Arch agreed to Addendum No. 11 based on representations by Underwriters about the commissions. And Glick stated in his deposition testimony that in the negotiations, the amount of return commissions came up and was discussed in connection with the discussions regarding renewal of the reinsurance agreement. Thus, Glick—who negotiated Addendum No. 11—was aware of at least the approximate amount of return commissions then owed. Accordingly, we hold that the trial court did not err by granting no-evidence summary judgment on Arch's fraudulent inducement claim based on failure to disclose.

*Fraud by Affirmative Misrepresentation*.

Regarding Arch's claim for fraudulent inducement by misrepresentation, it argues that Underwriters "misrepresented to Glick that [its] financial condition was such that the minimum 27% commission was no longer feasible" and that Glick relied on these representations to Arch's detriment.

In response to Underwriters's summary judgment ground that there was no evidence of justifiable reliance by Arch on an actionable misrepresentation by Underwriters, Arch pointed to deposition testimony by Glick; a report written by Glick after a February 2007 meeting with Underwriters's representatives; deposition testimony by Steve Harvey, president of Underwriters; and deposition testimony of Sharron Barton, an Underwriters employee. The deposition

27

testimony showed (1) that Underwriters told Glick that the twenty-seven percent was a difficult minimum for it to work with and that Underwriters was not making as much money on the deal as it would have liked, and (2) that Glick had responded that if it was not a good deal for Underwriters, then it was not a good deal for Arch, and that if Underwriters were not in business then "we don't have an opportunity to make money on the program."  Glick's report stated that Underwriters wanted the commission raised to thirty percent and was willing to adjust the commission scale so that it received a lower commission "of the upside," that is, if Arch's losses were less than expected.  None of the evidence pointed out by Arch shows that Glick relied on any affirmative representations by Underwriters about its financial condition in making his decision to execute Addendum No. 11.  Thus, the trial court did not err by granting summary judgment on this claim.[31]

Because Arch failed to produce sufficient summary judgment evidence to show that Glick relied on representations about Underwriters's financial position, we do not reach Arch's argument that the trial court abused its discretion by failing to compel discovery about Underwriters's financial situation or that the trial court erred by granting summary judgment for Underwriters based on the economic loss rule.  We overrule Arch's eleventh issue.

---

[31]*See* Tex. R. Civ. P. 166a(i) & cmt.

**Is either party entitled to attorney's fees?**

In its twelfth issue, Arch asks whether the trial court erred by awarding Underwriters's attorney's fees. In its thirteenth and final issue, Arch asks whether it is entitled to attorney's fees as a matter of law.

Under its twelfth issue, Arch argues that as a matter of law, Underwriters was not entitled to the attorney's fees awarded to it by the trial court; alternatively, Arch argues that the trial court abused its discretion by awarding them. Arch contends that Underwriters's claim for declaratory relief was duplicative of the issues litigated on Arch's breach of contract claim, and therefore, Underwriters was not entitled to attorney's fees.

We review a trial court's grant of attorney's fees in a declaratory judgment action for abuse of discretion.[32] Under the Texas Declaratory Judgment Act (the DJA), a court "may award costs and reasonable and necessary attorney's fees as are equitable and just."[33]

On May 10, 2010, Arch sought to amend its pleadings to, among other things, drop its declaratory judgment claim. Underwriters then moved to amend its answer in order to file a counterclaim for declaratory relief. It asked for a declaration that Addendum No. 11 was valid and enforceable. In Arch's third

---

[32]*NP Anderson Cotton Exch., L.P. v. Potter*, 230 S.W.3d 457, 466 (Tex. App.—Fort Worth 2007, no pet.).

[33]Tex. Civ. Prac. & Rem. Code Ann. § 37.009; *see also Potter*, 230 S.W.3d at 466.

29

amended petition, it asserted a claim for breach of contract as well as a claim for fraudulent inducement challenging the validity of Addendum No. 11. Thus, Underwriters did not seek additional relief that had greater ramifications than Arch's original suit, and its claim merely addressed issues already pending before the court.[34] Accordingly, Underwriters's DJA claim was not proper, and, therefore, the trial court abused its discretion by awarding attorney's fees to Underwriters based on its declaratory judgment claim. Because Underwriters did not assert any other ground for recovering attorney's fees, we sustain Arch's twelfth issue.

In its thirteenth issue, Arch argues that it established its breach of contract claim as a matter of law, that judgment should therefore be rendered in its favor, and that the case should be remanded to the trial court for a determination of its attorney's fees. Because we have held that the trial court did not err by rendering judgment for Underwriters, we overrule this issue.

## Conclusion

Having sustained Arch's twelfth issue, we modify the trial court's judgment to omit the award of attorney's fees to Underwriters. Having overruled Arch's

---

[34] *See BHP Petroleum Co. Inc. v. Millard*, 800 S.W.2d 838, 841 (Tex. 1990) (stating that the DJA is not available to settle disputes already pending before a court and noting that "[t]o qualify as a claim for affirmative relief, a defensive pleading must allege that the defendant has a cause of action, independent of the plaintiff's claim, on which he could recover benefits, compensation or relief, even though the plaintiff may abandon his cause of action or fail to establish it").

remaining twelve issues, we affirm the remainder of the trial court's judgment as modified.

                                        LEE ANN DAUPHINOT
                                        JUSTICE

PANEL: LIVINGSTON, C.J.; DAUPHINOT, J.; and DIXON HOLMAN (Senior Justice, Retired, Sitting by Assignment).

DELIVERED: April 26, 2012